UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT HOMRICH,

      Plaintiff,

                                Case No. 1:25-cv-296

v.

                                Hon. Hala Y. Jarbou

CITY OF WYOMING, et al.,

      Defendants.

_____/

## OPINION

Plaintiff Robert Homrich brings this lawsuit under 42 U.S.C. § 1983 and state tort law against Defendant City of Wyoming, Michigan ("the City"), as well as two police officers employed by the City—Officer Chad Lynn and Deputy Chief Kip Snyder—in their individual capacities. Homrich alleges that after he repeatedly contacted city officials to express policy disagreements, the City arrested him and charged him with violating a municipal ordinance that prohibits harassing communications. He also alleges that when he posted critical comments about the arrest on the City's Facebook page, it removed the comments and banned him from posting. Homrich brings (1) Fourth Amendment claims for unlawful arrest, unlawful search, and malicious prosecution; (2) First Amendment claims for retaliatory arrest, enforcement of a content-discriminatory ordinance, and implementation of a viewpoint-discriminatory Facebook ban; and (3) state tort claims for false arrest and battery. Homrich seeks damages, a declaration that his arrest violated the Fourth Amendment, a declaration that the municipal ordinance at issue violates the First Amendment, and an injunction requiring the City to unblock him on Facebook.

On June 2, 2025, Defendants moved to dismiss for failure to state a claim and, as to one of the counts, lack of subject matter jurisdiction (ECF No. 7).[1]  Defendants argue that (1) Homrich fails to state a claim as to any of his counts; (2) Homrich lacks standing to seek a declaratory judgment as to the constitutionality of the ordinance at issue; (3) the individual Defendants have qualified immunity from the federal claims; and (4) all Defendants have governmental immunity from the state claims. As explained below, the Court will grant in part and deny in part the motion to dismiss. Specifically, Homrich's claims that survive are (1) the Fourth Amendment false arrest and malicious prosecution claims against the individual Defendants; (2) the First Amendment retaliatory arrest claims against the individual Defendants; (3) the state false arrest and battery claims against the individual Defendants; and (4) the First Amendment claim against the City for the Facebook ban.

## I. BACKGROUND

The following summarizes the facts as described by Homrich, whose well-pleaded allegations are treated as true at this stage. *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017). The background for this lawsuit began in April 2022 at University of Michigan Health-West Hospital, where Homrich received treatment for an asthma attack. (Compl.  ¶¶ 13-14, ECF No. 1.) Homrich tried to leave the hospital because he believed its staff had improperly administered medication to him, but he was treated aggressively by a security guard, who forced Homrich to return to his room. (*Id.* ¶¶ 15-18.) After this incident, the hospital contacted the Wyoming Police Department and falsely reported that Homrich was refusing to leave.  (*Id.* ¶ 19.)  The police came

---

[1] Defendants style their motion as merely for failure to state a claim, but they challenge Homrich's standing to bring one of his claims, which goes to this Court's subject matter jurisdiction.

to the hospital, and Homrich requested that they file assault and battery charges against the security guard.  (*Id.* ¶ 21.)  The police then escorted Homrich from the hospital.  (*Id.* ¶ 22.)

Homrich subsequently attempted to contact the City to address his concerns about how the hospital had treated him. On April 26, 2022, he sent an email to the Wyoming City Attorney's Office about the incident.  (*Id.* ¶ 23.)  Several weeks later, on May 16, he got in contact with Heather Chapman from the City Attorney's Office. Chapman told Homrich her office was not planning to charge the hospital security guard, but would "consider" it if Homrich provided more evidence.  (*Id.* ¶ 25.)  Over the next two days, Homrich sent "a series of emails" to Chapman containing evidence that the hospital filed a false police report about Homrich refusing to leave.  (*Id.* ¶ 26.)  Homrich then called Chapman on June 2, 2022, but she again declined to pursue charges against the hospital staff.  (*Id.* ¶ 27.)  Later that day, Homrich called the City's human resources department to file a complaint against Chapman.  (*Id.* ¶ 28.)  After he did not receive a response, on July 11, 2022, Homrich called Jennifer Stowell at the City Manager's Office "several" times about the issue, but did not reach her.  (*Id.* ¶ 29.)  He left "several" more messages for her, including on July 13, July 25, and August 2, 2022, but received no response.  (*Id.* ¶ 30.)

Stowell apparently became concerned that Homrich would come in person to the office, so she complained to the City about him, and the City contacted the police department.  (*Id.* ¶ 31.)  On August 4, 2022, Deputy Chief Snyder called Homrich and told him "that he needed to stop calling City Hall or else he would be arrested for making harassing phone calls."  (*Id.* ¶¶ 32-33.)  Homrich responded that he did not intend to harass anyone.  (*Id.* ¶ 34.)  Homrich then called Stowell's office and left a message "explaining that it had not been his intent to harass her, that he was simply calling her with questions and concerns that had not been answered, [that] it was his constitutional right to do so, and that calling the police was not productive, or words to that effect."

(*Id.* ¶ 35.)  Homrich then called Internal Affairs at the police department to file a complaint about Snyder's threat, but the person he spoke to refused to take his complaint.  (*Id.* ¶ 36.)

On August 18, 2022, Officer Lynn obtained a warrant from a Kent County magistrate to arrest Homrich for violations of the City's "Harassing [C]ommunication" ordinance, Wyoming, Mich., Mun. Code § 50-63 (2025).[2]  (*See* Aff. & Warrant, ECF No. 7-2.)  The ordinance provides that "[i]t shall be unlawful for any person by the use of a telephone, to . . . [d]isturb the peace, quiet, or privacy of any person or family by repeated and continued calls intended to harass or disturb the person or family to whom the calls are made." § 50-63(a).  It also bars the same conduct when conducted through "electronic communication," including email.  § 50-63(b)-(c).  Lynn, as the complaining witness, stated that Homrich "did by use of a telephone or other electronic communications, disturb the peace and quiet or privacy of a person or family by repeated and continued communications intended to harass or disturb the person or family to whom the communications are made, to wit: The City of Wyoming." (Aff. & Warrant, PageID.68.)  Homrich alleges "upon information and belief" that Lynn obtained the warrant "with encouragement from [Snyder], in retaliation against Mr. Homrich." (Compl. ¶ 41.)

On September 3, 2022, Homrich posted a video on YouTube claiming that the City had threatened to arrest him for exercising his First Amendment rights.  (*Id.* ¶ 37.)  He also sent the video to Chapman and Stowell, and posted it on the City's Facebook page. (*Id.* ¶ 38.)  Soon after, the City deleted Homrich's prior comments on the Facebook page and blocked him from posting further. (*Id.* ¶ 39.)  He remains blocked as of the filing of this lawsuit on March 17, 2025.  (*Id.* ¶ 40.)

---

[2] A copy of the ordinance is available at ECF No. 11-1.

On October 26, 2022, the Ottawa County Sheriff's Department arrested Homrich based on the August 18, 2022, warrant.  (*Id.* ¶ 42.)  Homrich was taken to jail and detained overnight, where he was searched.  (*Id.* ¶ 43.)  He alleges he did not receive proper medical treatment while in jail. (*Id.*)  The City eventually dismissed the charges in or around September 2023.  (*Id.* ¶ 46.)  Homrich alleges that these events caused "humiliation, embarrassment, fear, emotional distress, anger, loss of self-esteem, a loss of freedom, a loss of enjoyment of life, and other damages."  (*Id.* ¶ 47.)

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

A complaint may be dismissed for failure to state a claim if it fails "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).  When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true."  *Parrino*, 869 F.3d at 397.

**B. Rule 12(b)(1)**

The standard for evaluating a Rule 12(b)(1) motion depends on the nature of the "attack" on subject matter jurisdiction.  A "facial attack" on subject matter jurisdiction "merely questions the sufficiency of the [complaint]."  *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).  Facial attacks are reviewed under the same standard as applied to a Rule 12(b)(6) motion: the Court accepts the plaintiff's well-pleaded allegations as true and asks whether subject matter jurisdiction exists based on the complaint.  *Id.*

No presumption of truth applies in a "factual attack" on subject matter jurisdiction.  *Id.* Factual attacks challenge the existence of jurisdiction based on facts outside the pleadings. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  To resolve a factual attack, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. . . . [T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  *Id.*  (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 890-91 (3d Cir. 1977)).  The plaintiff bears the burden of proof of jurisdiction when a factual attack is made.  *Id.*  And the Court has "broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists[.]" *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014).

Because the Defendants argue a lack of standing based on the allegations in the complaint, the Court treats this as a facial attack on subject matter jurisdiction.

## III. ANALYSIS

### A. Standing

Defendants contend that Homrich lacks standing to seek a declaration that § 50-63 is unconstitutional.[3]  (Defs.' Br. 18-19, ECF No. 7-1.)  "Standing ensures that the plaintiff has a 'personal stake in the outcome of the controversy' at the outset of litigation." *Williams v. City of Cleveland*, 907 F.3d 924, 933 (6th Cir. 2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "Importantly, plaintiffs must establish standing for each form of relief they seek, and the type of harm alleged impacts the available relief." *Simpson-Vlach v. Mich. Dep't of Educ.*, No. 22-1724, 2023 WL 3347497, at *4 (6th Cir. May 10, 2023).  If a plaintiff lacks standing to seek a form of relief, the court lacks subject matter jurisdiction to grant that relief.  *State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019).

The requirements necessary to obtain standing for declaratory relief are different from those necessary to obtain standing for damages.  "Past harm allows a plaintiff to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief.   This is because the fact that a harm occurred in the past 'does nothing to establish a real and immediate threat that' it will occur in the future, as is required for injunctive [or declaratory] relief." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983)).  To obtain standing for declaratory relief, Homrich "must plead either a future injury that is 'certainly impending' or presents a 'substantial risk' of occurrence, or a past injury that presents 'continuing, present adverse effects[.]'"  *Simpson-Vlach*, 2023 WL

---

[3] Defendants also contend that Homrich lacks standing to seek injunctive relief against the enforcement of § 50-63. However, Homrich does not appear to request this relief.  Regardless, the standing analysis here applies equally to injunctive relief.  *See Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019) ("Obtaining standing for declaratory relief has the same requirements as obtaining standing for injunctive relief.").

3347497, at *4 (internal citation omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Sullivan v. Benningfield*, 920 F.3d 401, 408 (6th Cir. 2019)).

The Court agrees with Defendants that Homrich has not sufficiently alleged standing to seek declaratory relief.  Homrich's arrest under the ordinance is a past harm, and therefore insufficient to create standing for prospective relief.  And Homrich has not alleged facts supporting an inference that he will be arrested or prosecuted in the future under § 50-63.

Homrich cites *Driehaus* for the proposition that past enforcement, combined with a threat of future enforcement, provides standing for a pre-enforcement challenge.  (Pl.'s Resp. 17, ECF No. 11.)  In *Driehaus*, the Supreme Court held that the plaintiffs had standing for a pre-enforcement challenge because they "allege[d] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exist[ed] a credible threat of prosecution thereunder." 573 U.S. at 159 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  To meet that standard, the *Driehaus* plaintiffs alleged plans to make particular statements that would subject them to prosecution.  Homrich has not alleged that he will continue to contact the City in a manner that will cause future prosecutions, so he cannot establish a substantial threat of future enforcement. "The mere *possibility* of prosecution" is insufficient—prosecution "must be *certainly impending*."  *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017).  And there is nothing in Homrich's allegations to establish a certainly impending prosecution.

Homrich points to Snyder's threat to arrest him for his phone calls as evidence that a future prosecution is likely.  (Pl.'s Resp. 17.)  However, this threat has already been carried out, and Homrich does not allege that Snyder has made additional threats since his last arrest.  Homrich contends that "[i]f the defendant ever unblocked [him], [he] wants to continue to post, and he might

get prosecuted again, given the defendant's persistence in blocking him and prosecuting him." (*Id.* at 24.)  But this vague allegation about Homrich's intent is in a response brief, and therefore cannot be considered in deciding the motion to dismiss.  *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020).  Moreover, Defendants' prior arrest of Homrich was related to his calls and emails to the City, not his Facebook posts, so an intent to continue posting does not indicate a likelihood of future prosecution under § 50-63.[4]

Homrich also seeks a declaratory judgment that his arrest was without probable cause and therefore in violation of the Fourth Amendment.  Although Defendants do not challenge Homrich's standing to seek this relief, the Court has an obligation to consider its subject matter jurisdiction sua sponte. *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 304 (6th Cir. 2019).  Homrich's request for declaratory judgment is entirely based on past actions—he does not allege that a similar arrest is likely to recur in the future.  The Court cannot grant a declaratory judgment as to the legality of past acts where "the only thing the plaintiff has to gain in obtaining the requested declaratory relief is moral satisfaction." *Spencer v. City of Hendersonville*, 487 F. Supp. 3d 661, 676 (M.D. Tenn. 2020), *aff'd*, No. 20-6168, 2021 WL 8016828 (6th Cir. Oct. 8, 2021).  Therefore, Homrich cannot seek a declaratory judgment as to the constitutionality of his arrest.

### B. Failure to State a Claim

#### 1. False Arrest

Homrich alleges that he was arrested without probable cause, in violation of the Fourth Amendment.  A defendant violates the Fourth Amendment's bar on unreasonable seizures if they arrest a person without "probable cause to believe that the [person] committed a crime or was in

---

[4] An intent to continue posting could be relevant to establish standing for an injunction against the Facebook ban, but Defendants do not challenge Homrich's standing to seek that relief; indeed, the continuing nature of the ban evidently creates standing to seek prospective relief.

the process of committing a crime."  *Fisher v. Jordan*, 91 F.4th 419, 424-25 (6th Cir. 2024).

Probable cause turns on "whether an objectively reasonable officer would conclude that there is a

'probability or substantial chance of criminal activity,' thereby justifying an arrest."  *Id.* at 425

(quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)).

### (a) Probable Cause

Homrich contends that Defendants lacked probable cause to arrest him for violating the

harassing communications ordinance, § 50-63.  The following are the contacts Homrich alleges he

had with the City prior to the issuance of the arrest warrant: (1) an April 26, 2022 email to the City

Attorney's Office; (2) a May 16, 2022, call with Heather Chapman from the City Attorney's

Office, in which she invited him to contact her further; (3) several emails to Chapman over the

next few days; (4) a call with Chapman on June 2, 2022; (5) a call to the human resources

department the same day to file a complaint against Chapman, to which Homrich received no

response; (6) several July 11, 2022, calls to Jennifer Stowell at the City Manager's Office "to

address [Homrich's] questions and concerns," which received no response; (7) several follow-up

messages to Stowell, including on July 13, July 25, and August 2, 2022, none of which received a

response; (8) an August 4, 2022, phone conversation initiated by Deputy Chief Snyder; (9) a

subsequent call to Stowell's office explaining that Homrich did not intend to harass her; (10) a

subsequent call to the Internal Affairs department to file a complaint about Snyder.

Defendants attempt to argue that probable cause existed by referring to a police report that

Homrich attached to his response to the motion to dismiss.  (Defs.' Reply 10, ECF No. 17; *see*

Police Report, ECF No. 11-3.)  However, the Court cannot consider exhibits to a response brief

on a motion to dismiss.  *See In re Fair Fin. Co.*, 834 F.3d 651, 656 n.1 (6th Cir. 2016).  Thus, the

Court will only rely on Homrich's allegations in determining whether probable cause existed.

Drawing all reasonable inferences for Homrich, *see Coley v. Lucas County,* 799 F.3d 530, 537 (6th Cir. 2015), no probable cause existed to arrest him for violating § 50-63.  Section 50-63 makes it unlawful to "disturb the peace, quiet, or privacy of any person . . . by repeated and continued calls [or e-mails] intended to harass or disturb the person."  § 50-63.  Homrich merely called and emailed his local government to discuss his concerns.  Though he made a substantial number of calls, they were over a large time span and to different people; the ordinance's language plainly prohibits repeated calls that disturb a *single* individual.  Homrich did call Stowell several times in one day, but there is no indication that the calls were anything but civil, so this alone does not establish an intent to harass.  Moreover, the workplace phones of public officials are not places of "peace, quiet, or privacy," so a few calls from a concerned citizen are unlikely to be disturbing.  And despite the warrant request listing the City of Wyoming as the victim (Aff. & Warrant, PageID.68), the statute's "harass or disturb" language implies that the "person" at issue must be a natural, rather than corporate, person.  Thus, the Wyoming Police lacked probable cause to arrest Homrich for violations of § 50-63.

### (b) Officer Defendants

Homrich alleges that both Lynn and Snyder are liable for obtaining the arrest warrant despite the lack of probable cause.  Though Lynn did not personally arrest Homrich (*see* Compl. ¶ 42), applying for a warrant without probable cause can itself be a constitutional violation, *see, e.g.*, *Gardner v. Evans*, 920 F.3d 1038, 1064 (6th Cir. 2019) ("In some circumstances, liability can attach to non-arresting officers, but the inquiry still turns on probable cause for the arrest itself."); *Malley v. Briggs*, 475 U.S. 335, 345 (1986) (explaining that liability exists when "a reasonably well-trained officer . . . . would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant"); *Fry v. Robinson*, 678 F. App'x 313, 318-19

(6th Cir. 2017) (allowing false arrest claim to proceed against officer who obtained warrant without probable cause).

As explained above, Lynn lacked probable cause to obtain an arrest warrant.  And though qualified immunity protects officers who make unlawful arrests that they "reasonably believed" to be lawful, *Wood v. Eubanks*, 25 F.4th 414, 421 (6th Cir. 2022), no officer could have reasonably believed that there was probable cause to find Homrich violated § 50-63.

Lynn contends that even if no probable cause existed, he is entitled to qualified immunity because the arrest was pursuant to a facially valid warrant, which provides a complete defense. (Defs.' Br. 6.)  However, "[t]he 'shield of immunity' otherwise conferred by the warrant will be lost . . . where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (cleaned up).  Therefore, an officer can be liable where "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* at 547 (quoting *Malley*, 475 U.S. at 341); *see Mills v. City of Barbourville*, 389 F.3d 568, 577 (6th Cir. 2004) (denying qualified immunity despite warrant due to "deficient affidavit supporting the warrant").

Here, the warrant application is so lacking that no reasonable officer would have viewed it as establishing probable cause.  Affidavits "require 'particularized facts' that show veracity, reliability, and a basis of knowledge that goes 'beyond bare conclusions and suppositions.'" *Fry*, 678 F. App'x at 319 (quoting *United States v. Rose*, 714 F.3d 362, 367 (6th Cir. 2013)). Defendants included with their motion to dismiss a document that they describe as the warrant and the supporting affidavit.  (Defs.' Br. 3.)  Lynn's warrant affidavit, in its entirety, states that Homrich,

> at or about [address], did by use of a telephone or other electronic communications, disturb the peace and quiet or privacy of a person or family by repeated and continued communications intended to harass or disturb the person or family to whom the communications are made, to wit: The City of Wyoming[.]

(Aff. & Warrant, PageID.68.)[5,6]  This affidavit recites the ordinance's language, but offers no facts about what Homrich did to violate the ordinance, or where the stated information comes from. "Providing the statutory language of the charged offense without at least identifying the basis of knowledge for it does not show probable cause." *Fry*, 678 F. App'x at 319.  Rather, a warrant application must "provide the affiant's answer to the hypothetical question, 'What makes you think that the defendant committed the offense charged?'" *United States v. Fachini*, 466 F.2d 53, 56 (6th Cir. 1972).

This warrant application does not explain why Officer Lynn thinks Homrich violated the ordinance.  It does not say whom Homrich contacted, or what he said to them, or how he disturbed them.  It claims that Homrich's victim was "The City of Wyoming," an entity incapable of being harassed or disturbed.  No reasonable officer would view the affidavit as sufficient, so it cannot protect Lynn from liability.  *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 563-65, 568 (1971) (warrant was invalid where application "clearly could not support a finding of probable cause" because it "consist[ed] of nothing more than the complainant's conclusion that the individuals named therein perpetrated the offense described in the complaint").

Defendants contend that Homrich does not sufficiently argue that the warrant was facially invalid or explain what about the warrant affidavit was false.  (Defs.' Reply 4-5.)  However, Homrich's complaint alleges that the warrant request falsely indicated he had violated § 50-63.

---

[5] The affidavit also specifies that the alleged violation occurred from about April 4, 2022, to August 8, 2022.  (*See* Aff. & Warrant, PageID.68.)

[6] The document that Defendants describe as the warrant itself merely repeats Lynn's statement as the basis for probable cause.  (*See* Aff. & Warrant, PageID.69.)

(Compl. ¶ 41.)  And the claim that Homrich had violated § 50-63 was essentially the entirety of the warrant affidavit, so alleging its falsity is equivalent to alleging that the warrant was facially invalid.

Furthermore, even if the warrant were facially valid, it would not preclude liability for an officer if the officer obtained the warrant by "'knowingly and deliberately, or with a reckless disregard for the truth, ma[king] false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (alterations except first in original) (quoting *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000)).  Based on the alleged facts, no reasonable officer could have concluded that—as Lynn claimed—Homrich had intentionally "disturb[ed] the peace and quiet or privacy of a person or family."  (Aff. & Warrant, PageID.68.)  The fact that Lynn obtained an arrest warrant without any semblance of probable cause, using a facially insufficient affidavit that falsely claimed Homrich had violated § 50-63, is enough at this stage to imply that Lynn made false statements deliberately or with reckless disregard for the truth.

Deputy Chief Snyder has a more attenuated connection to the warrant request, but that connection is still sufficient to establish liability at this stage.  Snyder allegedly called Homrich two weeks before the warrant issued and said "that he needed to stop calling City Hall or else he would be arrested for making harassing phone calls." (Compl. ¶ 33.)  Homrich also alleges that Snyder "encourage[d]" Lynn to apply for the warrant.  (*Id*. ¶ 41.)  Viewed in the light most favorable to Homrich, Snyder's statement during the phone call—combined with Snyder's status as a supervisory officer—suggests that Snyder was involved in obtaining the arrest warrant.  "To establish a § 1983 . . . claim against a public official in his personal capacity, a plaintiff must show that the official either actively participated in the alleged unconstitutional conduct or implicitly

14

authorized, approved or knowingly acquiesced in the alleged unconstitutional conduct of an offending subordinate." *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (internal quotation marks omitted).  Homrich's allegations are sufficient to establish an inference that Snyder participated in, or at least implicitly authorized, the attainment of the arrest warrant.  These allegations also support an inference that Snyder encouraged or authorized Lynn to make intentionally false statements, or statements made with reckless disregard for the truth.   And Snyder is not entitled to qualified immunity for the same reasons that apply to Lynn: no reasonable officer would have believed that probable cause existed or was established by the warrant request.

Defendants argue that Homrich forfeited his claim that Snyder directed Lynn to obtain the warrant because Homrich failed to properly respond to their argument.  (Defs.' Reply 1.)  But Homrich did address Defendants' argument on this issue.  (*See* Pl.'s Resp. 15.)  Defendants also contend that the police report refutes Homrich's claim that Snyder directed Lynn to seek the warrant (Defs.' Reply 1-2), but that report was attached to Homrich's response to the motion to dismiss, so the Court cannot consider it in deciding the motion to dismiss, *see Fair*, 834 F.3d at 656 n.1.

In sum, Homrich has stated claims against Lynn and Snyder for false arrest.

### (c) City of Wyoming

Homrich also brings a *Monell* claim against the City, alleging that it is liable for the arrest based on the actions of its officers.  *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978). "[U]nder § 1983, local governments are responsible only for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (alteration in original) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)).  "To properly allege a municipal liability claim, a plaintiff must adequately allege (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision

making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance of or acquiescence to federal rights violations." *Id.* (cleaned up).

Homrich frames his claim under the second prong, but offers only the conclusory allegation that the decision to charge him was "made by the person or persons with final decision-making authority for those decisions in the City of Wyoming." (Compl. ¶ 55.)  Homrich alleges no facts supporting the inference that an official with final policymaking authority was responsible for his arrest.  Although the officials who charged and arrested Homrich may have been acting pursuant to their discretionary authority, "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986).  Rather, "[t]he official must also be responsible for establishing final government policy respecting such activity." *Id.* at 482-83.

The facts as alleged suggest that those responsible for Homrich's arrest lacked policymaking authority.  "[W]hether an official had final policymaking authority is a question of state law." *Id.* at 483.  Wyoming's Municipal Code and Charter appear to give authority for arresting and charging decisions to the Chief of Police—who is "responsible for the enforcement of law and order"—and the City Attorney, who "shall prosecute . . . ordinance violations." Wyoming, Mich., Mun. Code § 46-33(a) (2025), https://perma.cc/HX4A-5QVA; Wyoming, Mich., Charter § 4.14(b) (2025), https://perma.cc/LR89-MYA6.  Homrich does not allege facts indicating that either the Chief of Police or the City Attorney participated in the decision to charge him.

In Homrich's response to the motion to dismiss, he contends that according to a police report—which he attached as an exhibit to his response—the City Attorney approved the warrant. (Pl.'s Resp. 16; Police Report 3, ECF No. 11-3.)  However, as noted above, the Court cannot consider exhibits attached to a response brief when deciding a motion to dismiss.  Homrich also alleges that the decision to charge him was part of "a policy of retaliation."  (Compl. ¶ 55.)  Such a conclusory allegation, absent any supporting facts, is insufficient to state a *Monell* claim. *Sistrunk v. City of Hillview*, 545 F. Supp. 3d 493, 501 (W.D. Ky. 2021).  Therefore, the Court will dismiss Homrich's claim against the City for unlawful arrest.

## 2. Malicious Prosecution

Homrich brings claims for malicious prosecution against all Defendants.  The elements of a Fourth Amendment malicious prosecution claim are:

> (1) that a criminal prosecution was initiated against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty . . . apart from the initial seizure; and (4) that the criminal proceeding [was] resolved in the plaintiff's favor.

*Jackson v. City of Cleveland*, 925 F.3d 793, 820 (6th Cir. 2019) (alterations except last in original).

### (a) Individual Defendants

As an initial matter, Defendants contend that Homrich abandoned his malicious prosecution claim against the individual defendants by not sufficiently responding to their arguments about it. (Defs.' Reply 3.)  Although Homrich's response brief only discusses malicious prosecution in the context of the City's liability, the discussion there applies to the officer Defendants as well, and some arguments that Homrich makes about the unlawful arrest claims apply equally to the malicious prosecution claims.  (*See* Pl.'s Resp. 10, 13-15.)  Thus, Homrich has sufficiently responded, and the Court will address the merits.

Lynn and Snyder challenge the first two elements of Homrich's malicious prosecution claim.  As to the participation element, Defendants argue that they were not responsible for Homrich's prosecution.  However, "an investigating officer does not escape liability just because someone else (e.g., the prosecutor) made the actual decision to prosecute, so long as the plaintiff can show that the officer influenced or participated in the decision to prosecute." *Tlapanco v. Elges*, 969 F.3d 638, 655 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Sampson v. Village of Mackinaw City*, 685 F. App'x 407, 417 (6th Cir. 2017)).  "'Providing reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor can constitute participation when (1) those materials formed the basis for the charge,' and '(2) the falsehoods, omissions, or misstatements were made deliberately or with reckless disregard for the truth.'"  *Id.* (quoting *Meeks v. City of Detroit*, 727 F. App'x 171, 178 (6th Cir. 2018)).

Homrich satisfies the participation element of a malicious prosecution claim because, as discussed above, he alleges facts supporting an inference that Lynn made false statements to the magistrate either deliberately or with reckless indifference, and that Snyder encouraged Lynn's actions.  *See Newman v. Township of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014) (a malicious prosecution claim can be brought when officer's "deliberate or reckless falsehoods result in arrest and prosecution without probable cause"); *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir. 2020) (plaintiff can establish malicious prosecution claim by showing that "the officer who applied for the warrant should have known that his application failed to establish probable cause").  And Homrich alleges that his conduct did not violate § 50-63, which supports the reasonable inference that Lynn's falsehoods were the primary reason the prosecutor charged him—that, as Homrich suggests, the officer Defendants "influence[d] a prosecutor to bring[] a prosecution against [him] without probable cause."  (Compl. ¶ 51.)  These allegations are sufficient to state a claim for

18

malicious prosecution. *See Sykes v. Anderson*, 625 F.3d 294, 316 (6th Cir. 2010) (officer can be liable for malicious prosecution based on false investigatory materials that prosecution relied on in initiating criminal proceedings); *Stacy v. Clarksville Police Dep't*, 771 F. Supp. 3d 1024, 1039 (M.D. Tenn. 2025) ("[I]t is at least plausible that [the] Officer [defendant] could reasonably foresee that his false Affidavit of Complaint would aid in the decision to prosecute [the plaintiff].").

These allegations are also sufficient to overcome the Defendants' assertion of qualified immunity. *See King v. Harwood*, 852 F.3d 568, 582–83 (6th Cir. 2017) ("[I]ndividuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has made, influenced, or participated in the decision to prosecute the plaintiff by, for example, knowingly or recklessly making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants." (internal quotation marks omitted)); *Stacy*, 771 F. Supp. 3d at 1038–39 (denying qualified immunity from malicious prosecution claim where officer "submitted an Affidavit of Complaint that lacked probable cause . . . , knew the affidavit lacked probable cause, and used the affidavit to secure an invalid Arrest Warrant").

Defendants also challenge the second element of Homrich's claim—the lack of probable cause—but as explained above, Homrich has sufficiently alleged that there was no reasonable basis to believe probable cause existed to support his arrest or (for the same reasons) his prosecution. As such, neither individual defendant is entitled to qualified immunity from Homrich's malicious prosecution claim.

Finally, Defendants argue that Homrich has not stated claims for malicious prosecution because these claims involve allegations of fraud and thus must be alleged with particularity under Rule 9(b). *See* Fed. R. Civ. P. 9(b). Rule 9(b) applies "to claims that sound in fraud," *Kolominsky v. Root, Inc.*, 100 F.4th 675, 683 (6th Cir. 2024), an analysis that depends largely on the elements

of a cause of action, *see Detrick v. KCS Int'l Inc.*, 781 F. Supp. 3d 588, 620 (N.D. Ohio 2025). Defendants cite no authority applying Rule 9(b) to a malicious prosecution claim.  *See Connolly v. Deutsche Bank AG*, No. 22-CV-9811 (JMF), 2023 WL 7168314, at *1 (S.D.N.Y. Oct. 31, 2023) ("[T]he Court has not found[] any authority supporting the proposition that Rule 9(b) applies to a malicious prosecution claim like [the plaintiff]'s."); *Morgan v. Cnty. of L.A. Dist. Att'y's Off.*, No. 2:23-CV-10474-MRA-MAR, 2025 WL 2376701, at *5 (C.D. Cal. July 21, 2025) ("The Court is not persuaded that Rule 9(b) applies because malicious prosecution does not involve allegations of fraud.").  Moreover, Rule 9(b) allows "intent, knowledge, and other" states of mind to be alleged generally.  Fed. R. Civ. P. 9(b).  Given that Homrich has specifically identified the allegedly false statement made to the magistrate, Defendants do not explain how Homrich's allegations fail to meet Rule 9(b)'s standards.  *See Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) (Rule 9(b) "requires a plaintiff: (1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent.").  Thus, Homrich has stated malicious prosecution claims against the individual Defendants.

### (b) City of Wyoming

Though Homrich's malicious prosecution claims against the individual Defendants survive, Homrich has not sufficiently alleged that the City itself was responsible for the prosecution.  As explained above, cities are only liable under § 1983 for acts that can be attributed to them.  Homrich merely alleges, in conclusory fashion, that the decision to charge him "constituted a policy" and was "made by the person or persons with final decision-making authority."  (Compl. ¶ 55.)  In the absence of more specific allegations, Homrich has failed to state a claim against the City.

### 3. Unreasonable Search

Homrich appears to also assert a Fourth Amendment claim based on the search that took place when he was held in Kent County Jail.  Defendants argue that this claim should be dismissed because the individual Defendants did not conduct the search.  Homrich failed to respond to this argument, and thus has forfeited his objection to it.  *See Ellison v. Knox County*, 157 F. Supp. 3d 718, 724-25 (E.D. Tenn. 2016) ("It is well established in the Sixth Circuit that failure to respond to an argument made in support of a Rule 12(b)(6) motion to dismiss a claim results in a forfeiture of the claim." (citing *Notredan, LLC v. Old Republic Exch. Facilitator Co.*, 531 F. App'x 567, 569 (6th Cir. 2013))); *Washington v. Roosen, Varchetti & Oliver, PPLC*, 894 F. Supp. 2d 1015, 1027 (W.D. Mich. 2012) ("Failing to respond to arguments properly raised in a motion to dismiss constitutes abandonment of that position.").  Furthermore, Homrich provides no authority for the proposition that a search conducted as part of a jail intake process violates the Fourth Amendment if the underlying arrest was unlawful.  The constitutionality of jail searches is based on the security needs of the jail.  *See Williams*, 907 F.3d at 935 ("Whether a prison search is constitutionally reasonable depends on whether the jail's need for the particular search outweighs the invasion of personal rights that the search entails." (internal quotation marks omitted)).  The security needs of a jail are unrelated to the lawfulness of the arrest that caused someone to be jailed.  Therefore, Homrich's claims related to the search at Kent County Jail will be dismissed.[7]

### 4. Excessive Force

Homrich lists excessive force as a claim in his complaint, though he makes no specific allegations related to this cause of action.  (Compl. ¶ 6.)  Indeed, Homrich does not allege any details about his arrest, or that the individual Defendants participated in it.  Rather, Homrich argues

---

[7] It is unclear if Homrich intends to bring this claim against the City or just the individual officers.  Regardless, the analysis here applies equally to all Defendants.

that "where there is an unconstitutional arrest, any force used in the course of the arrest is unnecessary, because no force is necessary." (Pl.'s Resp. 25.)  However, the case Homrich cites for this principle, *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996), does not support—or even mention—the principle.  In fact, the Sixth Circuit has held that "force is not per se excessive when used to make a false arrest."  *Gray v. Shelby County*, No. 22-5542, 2023 WL 5237373, at *6 (6th Cir. Aug. 15, 2023).  Rather, "a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim."  *Id.* (quoting *Bashir v. Rockdale County*, 445 F.3d 1323, 1331 (11th Cir. 2006)).  Thus, Homrich fails to state an excessive force claim against Defendants.

### 5. Retaliatory Arrest

Homrich alleges that Defendants caused him to be arrested because he submitted complaints to the City, which (he contends) constitutes retaliation in violation of the First Amendment.  "To allege a retaliation claim, [a plaintiff] must show that: (1) he engaged in a constitutionally protected activity, (2) the officers' adverse actions caused [him] to suffer an injury that would likely chill a person of ordinary firmness from continuing that activity, and (3) the officers were motivated, at least in part, by his exercise of his constitutional rights."  *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019) (internal quotation marks omitted).  Furthermore, "to bring a First Amendment retaliatory arrest claim, a plaintiff must generally show that there was no probable cause for the arrest."  *Id.* at 430 (citing *Nieves v. Bartlett*, 587 U.S. 391, 406 (2019)).

Defendants argue that Homrich's retaliatory arrest claims should be dismissed because probable cause existed for the arrest, and because Homrich failed to plead a causal link between his protected speech and the arrest.  As discussed above, the Court is not persuaded that probable cause existed to arrest Homrich.  As to the causal link, Defendants argue that the police obtained the warrant before Homrich's protected activity, i.e. his YouTube video.  (Defs.' Br. 14.)

22

However, Homrich's reference to "protected activity" in his complaint presumably includes his calls and emails to the City (Compl. ¶ 41), which took place before the police obtained the warrant. And Homrich sufficiently alleges that Lynn and Snyder arrested him at least in part because of those calls.  (*See* Compl. ¶ 41.)

Defendants contend that Homrich's allegation of retaliatory motive is insufficient because it is premised on "information and belief."  (Defs.' Br. 15 (quoting Compl. ¶ 41).)  But "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged on information and belief where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Cassidy v. Teaching Co.*, No. 2:13-CV-884, 2014 WL 1599518, at *3 (S.D. Ohio Apr. 21, 2014) (internal quotation marks omitted) (quoting *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).  Here, Homrich has alleged facts that plausibly suggest Lynn and Snyder acted out of a retaliatory motive.  Before the police obtained the warrant, Snyder called Homrich and threatened him with arrest if he did not stop calling the City.  Lynn then obtained an arrest warrant despite an obvious lack of probable cause.  Drawing all reasonable inferences for Homrich, it is plausible that Snyder and Lynn acted out of retaliation for the complaints Homrich had made.

Although Homrich has stated a claim for retaliatory arrest against the individual Defendants, he has failed to state a claim against the City.  As explained above, Homrich does not allege facts indicating the officers' actions were pursuant to a City policy or practice.  Thus, the retaliatory arrest claim against the City will be dismissed.

### 6. Constitutionality of Section 50-63

#### (a) Overbreadth

Homrich alleges that § 50-63 is overbroad, in violation of the First Amendment.  An overbreadth claim can invalidate a law that has *some* constitutional applications if "a substantial number of instances exist in which the law cannot be applied constitutionally." *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (internal quotation marks omitted).  However, "plaintiffs raising overbreadth claims cannot pursue monetary relief because damages are available only for violation of the plaintiff's own rights, not the rights of third parties." *Davis v. Colerain Township*, 51 F.4th 164, 176 (6th Cir. 2022) (internal quotation marks omitted).  And, as discussed above, Homrich lacks standing to pursue prospective relief related to the constitutionality of § 50-63.  Therefore, no relief is available to Homrich for his overbreadth claim, and it will be dismissed.

#### (b) Vagueness

Homrich also alleges that § 50-63 is impermissibly vague, in violation of the Fourteenth Amendment's Due Process Clause.  "An ordinance is void for vagueness 'if its prohibitions are not clearly defined.'"  *Gaughan v. City of Cleveland*, 212 F. App'x 405, 409 (6th Cir. 2007) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).  "Specifically, a law is impermissibly vague if it 'denies fair notice of the standard of conduct for which the citizen is to be held accountable,' or gives law enforcement officials 'an unrestricted delegation of power which leaves the definition of its terms to [them].'"  *Id.* (alteration in original) (quoting *Am.–Arab Anti–Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608–09 (6th Cir. 2005)).

Section 50-63 provides that "[i]t shall be unlawful for any person by the use of a telephone, to . . . [d]isturb the peace, quiet, or privacy of any person or family by repeated and continued calls intended to harass or disturb the person or family to whom the calls are made." § 50-63.  The only aspect that Homrich specifically identifies as vague is the word "harass," which the statute does

not define. (Pl.'s Resp. 17.)   However, the Court of Appeals has previously upheld against a vagueness challenge a federal statute prohibiting "mak[ing] a telephone call . . . with intent to annoy, abuse, threaten, or harass any person." *United States v. Bowker*, 372 F.3d 365, 380 (6th Cir. 2004); 47 U.S.C. § 223(a)(1)(C).  The court reasoned that although the statute did not define "harass," it provided sufficient notice "because citizens need not guess what terms such as 'harass' . . . mean." *Bowker*, 372 F.3d at 380-82.  Rather, the meaning of statutory terms like "harass" "can be ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning." *Id.* at 381 (quoting *Staley v. Jones*, 239 F.3d 769, 791 (6th Cir. 2001)).  Section 50-63 also requires a particular effect of the harassing speech—namely, that it "[d]isturb[s] the peace, quiet, or privacy of any person"— and the court in *Bowker* viewed a similar effects requirement as a factor in favor of upholding the challenged statute.  *Id.* at 381-82.

Additionally, § 50-63 has an intent requirement, and "[c]ourts are in virtually unanimous agreement that the requirement of specific intent (that is, requiring the government to prove that the caller's subjective purpose in making the call was to annoy or harass) saves [harassment] statutes . . . from vagueness problems." *United States v. De Anda*, No. 18-CR-00538-TSH-1, 2019 WL 1207452, at *3 (N.D. Cal. Mar. 14, 2019) (alteration in original); *see also McKillop v. State*, 857 P.2d 358, 364 n. 6 (Alaska Ct. App. 1993) (collecting cases); *Robinson v. Township of Waterford*, No. 84–1579, 1989 WL 94569, at *5 (6th Cir. Aug. 18, 1989) (upholding statute against vagueness challenge because it "contains an explicit requirement of a specific intent to annoy others").  Thus, Homrich's vagueness challenge to § 50-63 fails.

### (c) As-Applied Challenge

Homrich also brings an as-applied challenge to § 50-63, alleging that the enforcement of the ordinance against him violated his First Amendment rights.  (Compl. 9; Pl.'s Resp. 17.)  "[A]n

'as-applied' challenge consists of a challenge to the statute's application only to the party before the court." *Amelkin v. McClure*, 205 F.3d 293, 296 (6th Cir. 2000). However, Homrich's as-applied challenge fails because he alleges that his actions did not actually violate the statute. (Compl. ¶ 41.)  This means that Homrich is not challenging the statute itself, but rather the misapplication of that statute by the police.  If the police lacked probable cause to arrest or charge Homrich under § 50-63, he cannot bring an as-applied challenge to the statute.  *See Johnson v. City of Saginaw*, No. 17-CV-13174, 2018 WL 11311306, at *3 (E.D. Mich. Aug. 27, 2018) (plaintiff cannot bring an as-applied challenge where she alleges that the statute was actually inapplicable to the facts); *Langford v. City of St. Louis*, 3 F.4th 1054, 1060 (8th Cir. 2021) ("If the police lacked probable cause to believe that Langford violated the ordinance, then she might establish a violation of the Fourth Amendment . . . .  But an improper arrest would not demonstrate that the ordinance violates the First Amendment . . . .").

### 7. State Tort Claims

Homrich also brings state tort claims for false arrest and battery against Lynn and Snyder.[8]

### (a) False Arrest

Homrich has sufficiently alleged false arrest claims against the individual Defendants.  "To prevail on a claim of false arrest . . . a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause." *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003).  As discussed above, Lynn and Snyder lacked probable cause to arrest Homrich when Lynn obtained an arrest warrant.

---

[8] Homrich purports to bring both a false arrest and a false imprisonment claim, but under Michigan law, false arrest is just a type of false imprisonment. *Lewis v. Farmer Jack Div., Inc.*, 327 N.W.2d 893, 900 n.4 (Mich. 1982) ("[F]alse arrest and false imprisonment are not separate torts, and . . . a false arrest is one way to commit false imprisonment; since an arrest involves a restraint, it always involves imprisonment.").

26

Defendants argue that Lynn and Snyder are not liable because they did not physically participate in the arrest. However, Lynn caused the arrest by obtaining the arrest warrant, and Snyder caused the arrest by allegedly encouraging Lynn to seek that warrant. Under Michigan law, an officer who causes a false arrest to occur can be liable even if they are not physically present for the arrest: "It is a well-established rule of law that a person who *instigates* the arrest of another person who turns out to be innocent is as liable for false arrest as if he made the arrest himself." *Lewis*, 327 N.W.2d at 903. Thus, "where an officer knowingly or recklessly includes false information in an affidavit in order to obtain a warrant he is liable for false arrest/false imprisonment and the damages that arose out of the issuance and execution of the warrant." *Newell v. Allen*, No. 285086, 2009 WL 1913210, at *4 (Mich. Ct. App. Jul. 2, 2009), *rev'd in part on other grounds sub nom. Newell v. Allan*, 779 N.W.2d 91 (Mich. 2010); *see Adams v. Nat'l Bank of Detroit*, 508 N.W.2d 464, 469 (Mich. 1993) ("[W]hen an arresting officer 'acts on the judgment' of the defendant, 'it may well be said that the defendant directed the arrest.'" (cleaned up) (quoting *Maliniemi v. Gronlund*, 52 N.W. 627, 627 (Mich. 1892))); *Schneider v. Shepherd*, 158 N.W. 182, 184 (Mich. 1916) (prosecutor can be liable for "instigating" false arrest).

Further, the issuance of a warrant here does not preclude liability, as "a complaining witness is not immune from a suit for false arrest, even if a warrant is issued, where 'the complaining witness did not act reasonably: for example when he knew, or should have known, that, were it not for his mistake, the arrest warrant would not have been issued.'" *Newell*, 2009 WL 1913210, at *4 (quoting *Raudabaugh v. Baley*, 350 N.W.2d 242, 248 (Mich. Ct. App. 1983)). Thus, Homrich has stated claims for false arrest against both individual Defendants.

### (b) Battery

Homrich has also sufficiently stated a claim for battery against both officers. "A battery is the wil[l]ful and harmful or offensive touching of another person which results from an act

27

intended to cause such a contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991). Generally, no battery liability attaches where officers "use such force as is reasonably necessary to effect a lawful arrest." *Young v. Barker*, 405 N.W.2d 395, 402 (Mich. Ct. App. 1987).  However, this principle does not protect the officer Defendants because the arrest itself was unlawful.

Defendants argue that the battery claims should be dismissed because "[t]here are no factual allegations that either Officer Lynn or Deputy Chief Snyder physically touched [Homrich]." (Defs.' Br. 29.)  As a general matter, a defendant is liable "[f]or harm resulting to [the plaintiff] from the tortious conduct of another" if the defendant "orders or induces the conduct, [and] knows or should know of circumstances that would make the conduct tortious if it were his own."  Restatement (Second) of Torts § 877 (A.L.I. 1979); *see also* 6 Am. Jur. 2d Assault & Battery § 97 (2025) ("Civil liability for assault and battery is not limited to the direct perpetrator of the act charged; it extends to any person who, by any means, encourages or incites that act or aids and abets it.").  Michigan tort law follows this general rule.  *See Brink v. Purnell*, 127 N.W. 322, 323 (Mich. 1910) (endorsing jury instruction that defendant can be liable if he "counseled, instigated, aided, and abetted in the assault upon the plaintiff"); *Castle v. Shoham*, No. 337969, 2018 WL 3746550, at *12 (Mich. Ct. App. Aug. 7, 2018) (acknowledging liability when one "knows that [an]other's [tortious] conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself"); *see also James v. Wilson*, 95 S.W.3d 875, 913 (Ky. Ct. App. 2002) (describing it as a "doctrine of law . . . uniformly accepted across the United States" that "a person is liable for the damages suffered by a tort victim if he knowingly aids or abets another person in committing the tort").

This principle entails that Lynn and Snyder can be held liable for the arrest of Homrich because they directed a third person (i.e., the arresting officer) to carry it out.  And a person's

liability for intentional torts extends to those consequences that they "believe[] . . . are substantially certain to result from it."  Restatement (Second) of Torts § 8A; *see also Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 531 N.W.2d 168, 184 n.16 (Mich. 1995) (Boyle, J., concurring) (describing § 8A as "definition of 'intent' in tort law'"), *abrogated on other grounds by Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832 (Mich. 1999); *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 718 (6th Cir. 2018) (under Michigan law, "if a defendant 'knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.'" (quoting Restatement (Second) of Torts § 8A cmt. b)).

The individual Defendants are thus liable for battery because Homrich's arrest was substantially certain to involve harmful or offensive contact.  The basic components of an arrest, such as being handcuffed, essentially always constitute offensive contact.  "Even the most peaceful arrest[] necessarily incorporates assault and battery, as physical contact is a part of the process." *McWilliams v. McWilliams*, No. 06 C 3060, 2007 WL 1141613, at *7 (N.D. Ill. Apr. 16, 2007); *see Kinnard v. Metro Police Dep't*, No. 306-0338, 2007 WL 1695381, at *8 (M.D. Tenn. June 8, 2007) ("Some measure of physical contact is present in every situation involving a custodial arrest."); *In re Scott Cnty. Master Docket*, 672 F. Supp. 1152, 1192 (D. Minn. 1987) ("Some physical touching is a necessary corollary to every arrest."); *District of Columbia v. Chinn*, 839 A.2d 701, 706 n.2 (D.C. Ct. App. 2003) ("An arrest situation necessarily involves a battery in the sense of an unwanted seizure or application of force."); *see also Young v. Barker*, 405 N.W.2d 395, 402 (Mich. Ct. App. 1987) ("[Plaintiff's] only claim of a battery is the touching which *necessarily* occurred during her arrest and detention." (emphasis added)).

One case that weighs against this conclusion is *Newell*, where the Michigan Court of Appeals held that an officer who allegedly made false statements to obtain a warrant could be liable for false arrest but not battery.  2009 WL 1913210, at *1.  The Court of Appeals explained that "the individual defendants were not present at the search or plaintiff's arrest and there is no evidence that they committed an assault or battery or used any force, let alone excessive force, against him."  *Id.*  Because this Court is not aware of a Michigan Supreme Court case directly addressing this issue, it "must ascertain from all available data, including the decisional law of the state's lower courts, what the state's highest court would decide if faced with the issue."  *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2001).  "[A] federal court may not disregard a decision of the state appellate court on point," including an unpublished decision, "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  *Id.* (quoting *Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir.1989)).  Here, the Court declines to follow *Newell* because that case's analysis of the relevant issue is cursory and unpersuasive.  The Court believes that the Michigan Supreme Court, applying general tort principles, would hold that an officer who wrongfully obtains an arrest warrant is liable for the battery that is substantially certain to occur as part of the ensuing arrest.  *See Sherrod v. McHugh*, No. CV 16-0816 (RC), 2017 WL 627377, at *5 (D.D.C. Feb. 15, 2017) (plaintiffs stated assault claim against officer who filed false police report because it was substantially certain to result in arrest).

Admittedly, Homrich does not allege a specific instance of offensive or harmful contact that occurred during the arrest.  However, for the same reason that a battery is substantially certain to result from an arrest, the allegation that Homrich was arrested supports a reasonable inference

30

that some offensive or harmful contact occurred.  Thus, Homrich has stated battery claims against Lynn and Snyder.

### (c) Governmental Immunity

All Defendants assert governmental immunity from the state tort claims.  Under Michigan law, government officials are immune from tort liability in certain circumstances.  *See* Mich. Comp. Laws § 691.1407.   In cases involving intentional torts, individual defendants have immunity for their acts if:

> (1) the acts were taken during the course of employment and the employees were acting, or reasonably believed that they were acting, within the scope of their authority, (2) the acts were taken in good faith, and (3) the acts were discretionary-decisional, as opposed to ministerial-operational.

*Bailey v. Fitzpatrick*, No. 329516, 2017 WL 104546, at *4 (Mich. Ct. App. Jan. 10, 2017) (quoting *Odom v. Wayne Co.*, 760 N.W.2d 217, 222 (Mich. 2008)).  Homrich has plausibly alleged that Officers Lynn and Snyder, in obtaining a warrant despite a clear lack of probable cause, did not reasonably believe they were acting within the scope of their authority, and did not act in good faith.  Thus, neither officer is entitled to immunity at this stage.

The City, on the other hand, is entitled to immunity from the tort claims.  If the officers "did not act in good faith or in the course of [their] employment, the defendant city is . . . immune, because it cannot be held vicariously liable for the intentional torts of its employees."  *Alexander v. Riccinto*, 481 N.W.2d 6, 9 (Mich. Ct. App. 1991).  On the other hand, if the officers "acted in good faith and in the course of [their] employment and w[ere] thus engaged in the exercise of a governmental function, the defendant city is [still] immune[] from tort liability."  *Id.*  Therefore, these claims will be dismissed.

### 8. Facebook Ban

Homrich also alleges that Defendants violated his First Amendment rights by blocking him from the City's Facebook page after he posted criticism of the City.  Though Homrich appears to bring this claim against all three Defendants, there is no indication from the alleged facts that either of the individual Defendants were involved in blocking Homrich on Facebook.  Therefore, the claims against Snyder and Lynn will be dismissed, and the Court will only analyze the claim against the City.

As an initial matter, Homrich seems to argue that the Facebook ban constitutes retaliation for protected speech (Pl.'s Resp. 3), which would violate the First Amendment, *see Sensabaugh v. Halliburton*, 937 F.3d 621, 627 (6th Cir. 2019).  However, a retaliation claim requires that Homrich suffered an adverse action that "would chill or silence a person of ordinary firmness from future First Amendment activities."  *Sensabaugh*, 937 F.3d at 628.  Homrich does not contend, and the Court does not believe, that being blocked from Facebook constitutes an adverse action in this sense.  Therefore, the Court will interpret Homrich's First Amendment claim as one for viewpoint discrimination.  The City contends that Homrich can only bring a retaliation claim because that is all he asserted in his complaint (Defs.' Reply 1), but the complaint alleges that the Facebook ban was caused by Homrich's prior posts criticizing the City (*see* Compl. ¶¶ 39, 61).  This allegation provided sufficient notice that Homrich was bringing a viewpoint discrimination claim.  *See Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 606 (6th Cir. 2022) ("[A]s a general rule, a plaintiff's complaint need not expressly plead legal theories; it is sufficient to plead factual allegations that can establish a viable theory."); *Stark v. Mars, Inc.*, 790 F. Supp. 2d 658, 664 (S.D. Ohio 2011) ("Even the failure to correctly categorize the legal theory giving rise to a claim does not require dismissal if the complaint otherwise alleges facts upon which relief can be granted.").

Homrich argues that the City's Facebook page is a public forum, which imposes restrictions on the government's ability to control speech.  There are four types of fora, and the type at issue determines the standard for government regulation of speech.  *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010).  First are "traditional public fora," which "include sidewalks, parks, and other areas that by 'tradition or by government fiat' are open to public assembly and debate."  *Id.* (quoting *Helms v. Zubaty*, 495 F.3d 252, 255 (6th Cir. 2007)).  Second are designated public fora, which the government creates "when it opens a piece of public property to the public at large, treating as if it were a traditional public forum."  *Id.*  In either type of forum, the government can impose "[r]easonable time, place, and manner restrictions," but it cannot impose restrictions based on viewpoint, and any restriction based on content must pass strict scrutiny, i.e., be narrowly tailored to a compelling government interest.  *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).  The third type of forum is a limited public forum, which "is limited to use by certain groups or dedicated solely to the discussion of certain subjects."  *Miller*, 622 F.3d at 534-35 (quoting *Summum*, 555 U.S. at 470).  "In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral."  *Summum*, 555 U.S. at 470.  The fourth and final type is a nonpublic forum, where "[t]he government may control access . . . 'based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'"  *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

Homrich suggests that the City's Facebook page is either a designated or limited public forum.  (Pl.'s Resp. 4-7.)  The City contends that its Facebook page is not a forum at all, but is rather a venue for government speech.  (Defs.' Br. 27.)  When "the government uses public

resources to proclaim a *government* message. . . . it may promote specific viewpoints at the expense

of others because the Free Speech Clause 'does not regulate government speech.'" *Am. Freedom*

*Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 490 (6th Cir. 2020)

(quoting *Summum*, 555 U.S. at 467).  The City also claims that Homrich did not properly respond

to this argument about government speech (Defs.' Reply 9), but Homrich explained at length why

the City's Facebook page should be considered a public forum (*see* Pl.'s Resp. 4-7).  Thus, the

Court will address the merits of the argument.

As other courts have recognized, "there is a dearth of Sixth Circuit authority addressing

whether blocking critics and deleting their comments on municipal Facebook pages violates the

First Amendment." *Blackwell v. City of Inkster*, 596 F. Supp. 3d 906, 924 (E.D. Mich. 2022).  In

an unpublished 2018 decision, the Court of Appeals explained that the success of such a claim

would depend on whether the page was a public forum or government speech, and on the nature

of the government restriction at issue.  *Lloyd v. City of Streetsboro*, No. 18-3485, 2018 WL

11298664, at *4 (6th Cir. Dec. 20, 2018).  However, the court did not decide either of those issues

in the case before it.  *See id.*

A few years later, the District Court for the Eastern District of Michigan addressed these

issues and held that the Inkster Police Department's Facebook page constituted a forum rather than

a vessel for government speech.  *Blackwell*, 596 F. Supp. 3d at 922.  The court reasoned that Inkster

used the Facebook page to communicate with its citizens about issues of public importance.  *Id.* at

921.  Further, Inkster freely allowed the public to interact with the page by commenting on or

"liking" posts.  *Id.*  The court also held that the plaintiff had alleged viewpoint discrimination, so

it was unnecessary to determine the type of forum—traditional, designated, limited, or

nonpublic—because viewpoint discrimination would be prohibited for all four.  *Id.* at 923.

The City attempts to distinguish *Blackwell* in several ways, but none are persuasive.  First, the City points out that the Facebook page in *Blackwell* was run by a police department rather than a city, but provides no explanation as to why this should affect the forum analysis.  (Defs.' Reply 7.)  Second, the City notes that the Facebook page in *Blackwell* explicitly welcomed public comment, whereas there is no allegation that the City did the same.  (*Id.*)  However, such an explicit statement is unnecessary given that "the 'interactive nature of Facebook' is one of the platform's 'defining characteristics.'"  *Blackwell*, 596 F. Supp. 3d at 921 (quoting *Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-2215-W, 2019 WL 4736208, at *10 (S.D. Cal. Sept. 26, 2019)).  The City created a page on a website that is dedicated to group interaction, and Homrich's allegations suggest the City allowed him to comment on their page prior to banning him.

Finally, the City argues that Homrich failed to allege that the City created, or intended to create, a public forum.  (Defs.' Reply 7.)  But the assertion that the City's Facebook page is a public forum is a legal rather than a factual claim, so Homrich did not have to include that assertion in his complaint as long as he alleged sufficient facts to support it.  *See Boshaw*, 32 F.4th at 606.

Several federal courts of appeal have found that government social media pages constitute forums subject to First Amendment protections.  In *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), *as amended* (Jan. 9, 2019), the Court of Appeals for the Fourth Circuit held that a Facebook page run by the Chair of a County Board of Supervisors was a public forum because the government had "intentionally opened the public comment section . . . for public discourse," and imposed no limits on public access or use.  *Id*. at 682 (cleaned up).  Importantly, the court noted that a Facebook page could contain government speech, in the form of the Chair's posts, while also including "interactive components" that are treated as forums.  *Id.* at 686.  The court therefore

held that it violated the First Amendment to ban someone from the page based on viewpoint.  *Id.* at 688.

The Court of Appeals for the Second Circuit came to a similar conclusion in *Knight First Amendment Institute at Columbia University v. Trump*, 928 F.3d 226 (2d Cir. 2019).[9]  There, the court held that President Donald Trump's Twitter account constituted a public forum because "[t]he Account was intentionally opened for public discussion when the President . . . repeatedly used the Account as an official vehicle for governance and made its interactive features accessible to the public without limitation."  *Knight*, 928 F.3d at 237.  Therefore, the President could not block users based on their viewpoint.  *Id.* at 237; *but see Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring in vacatur of judgment) (public forum doctrine may not apply to social media pages of government officials because companies ultimately control the forum).  The Court of Appeals for the Ninth Circuit has likewise held that Facebook pages operated by members of a school board of trustees constituted public fora.  *See Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1179 (9th Cir. 2022) [10]; *see also Charudattan v. Darnell*, 834 F. App'x 477, 480 (11th Cir. 2020) ("In a prior order, the district court determined that the Sheriff's Office Facebook page was a limited public forum, and no party argues to the contrary on appeal.").

The City cites only one case to support its argument that the Facebook page constitutes government speech.  In *Morgan v. Bevin*, a district court declined to preliminarily enjoin the

---

[9] The Supreme Court granted certiorari and vacated the judgment in this case because the issue had become moot.  *See Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).  "Because this Court only looks to the case as persuasive authority, it is irrelevant that the case has been vacated . . . ."  *Barrett v. Harrington*, 130 F.3d 246, 258 (6th Cir. 1997).

[10] This case was subsequently abrogated by the Supreme Court on other grounds.  *See O'Connor-Ratcliff v. Garnier*, 601 U.S. 205 (2024).  On remand, the Ninth Circuit reiterated its public forum determination.  *Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181, 1187 (9th Cir. 2025) ("[O]ur earlier substantive First Amendment holdings—that the social media accounts constituted public fora . . .—also remain binding.").

Governor of Kentucky from blocking users on his Twitter and Facebook accounts.  298 F. Supp. 3d 1003, 1005 (E.D. Ky. 2018).  The court held that the plaintiffs were not substantially likely to succeed on their First Amendment claims because the Twitter and Facebook pages were tools for private speech, rather than public fora.  *Id.* at 1010-11.  The court explained that "Governor Bevin's Twitter and Facebook accounts are a means for communicating his own speech, not for the speech of his constituents."  *Id.* at 1011.  This conclusion was based on several details about the pages: they were intended to communicate specific messages to the public, they allowed people only to comment and not to make their own posts, and they had automatic filters to delete certain comments.  *Id.* at 1011-12.  In other words, the Governor "never intended his Facebook or Twitter accounts to be like a public park, where anyone is welcome to enter and say whatever they want."  *Id.* at 1011.  The court also reasoned that if the Governor was required to treat the pages as public fora, he might have to shut them down entirely due to the influx of spam.  *Id.* at 1012 (citing *Summum*, 555 U.S. at 480 ("[W]here the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place.")).

This Court is not persuaded by *Morgan*, for several reasons.  First, *Morgan*'s analysis rests on various aspects of the social media pages that are not clear from the record at this stage.  Second, this Court disagrees with *Morgan*'s conclusion that the government must remove posts in a viewpoint- or content-discriminatory manner in order for a social media page to function.  *See Blackwell*, 596 F. Supp. 3d at 920 (government speech doctrine is inapplicable to Facebook page because it is not the case that "government would not work" if it could not regulate the page (quoting *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015))).  Third, *Morgan* characterized the ultimate issue as whether those posting on social media could "force [the Governor] to listen to their views." 298 F. Supp. 3d at 1005.  The Court is persuaded

instead that the issue is a poster's views being accessible to the public, which is at the core of forum analysis. *See Leuthy v. LePage*, No. 1:17-CV-00296-JAW, 2018 WL 4134628, at *16 (D. Me. Aug. 29, 2018) (disagreeing with *Morgan*'s conclusion "that allowing a post to remain on a social media page amounts to 'listening'").

Fourth, there is no risk here that a viewer of the City's Facebook page will misinterpret comments by individuals as speech of the City. *See id.* ("[T]he Court is unconvinced that the Governor adopts as his own speech each undeleted post made by someone else on the page."); *Blackwell*, 596 F. Supp. 3d at 920 (people who see comments by individuals on government Facebook page "could not "reasonably[ ]interpret them as conveying some message on [the government's] behalf" (first alteration in original) (quoting *New Doe Child #1 v. Cong.*, 891 F.3d 578, 593 (6th Cir. 2018))). Fifth, social media is distinguishable from areas where the Supreme Court has declined to apply forum analysis, such as art endowments and television broadcasting, "because social media does not involve finite resources." *Attwood v. Clemons*, 526 F. Supp. 3d 1152, 1169 (N.D. Fla. 2021) (citing *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672-74 (1998)).

Finally, "[t]he majority of courts that have addressed the issue have concluded that when a government official uses a social media account for official business, and when the interactive portions of the account are open for public comment, those interactive portions are a public forum." *Felts v. Reed*, 504 F. Supp. 3d 978, 985 (E.D. Mo. 2020); *see also Sgaggio v. Young*, No. 20-CV-01977-PAB-NYW, 2022 WL 970008, at *5-7 (D. Colo. Mar. 31, 2022) (city police department's Facebook page constituted public forum); *Windom v. Harshbarger*, 396 F. Supp. 3d 675, 683 (N.D. W. Va. 2019) (government official's Facebook page constituted public forum where official "encouraged, solicited and allowed public comments"); *Anderson v. Hansen*, 519 F. Supp. 3d 457,

468 (E.D. Wis. 2021) (school district's Facebook page constituted public forum "because the District allowed members of the public to write their own comments underneath the post"); *Scarborough v. Frederick Cnty. Sch. Bd.*, 517 F. Supp. 3d 569, 576–80 (W.D. Va. 2021); *Markey v. Thompson*, No. CV 22-4307, 2025 WL 1748051, at *4-7 (E.D. Pa. June 24, 2025); *Leuthy*, 2018 WL 4134628, at *16; *Price v. City of New York*, No. 15 CIV. 5871 (KPF), 2018 WL 3117507, at *14 (S.D.N.Y. June 25, 2018); *Campbell v. Reisch*, 367 F. Supp. 3d 987, 992 (W.D. Mo. 2019); *Faison v. Jones*, 440 F. Supp. 3d 1123, 1137 (E.D. Cal. 2020); *One Wis. Now v. Kremer*, 354 F. Supp. 3d 940, 953 (W.D. Wis. 2019); *Fox v. Faison*, 668 F. Supp. 3d 751, 762 (M.D. Tenn. 2023).

Homrich's complaint provides admittedly few details about the City's Facebook page.  He attempts to add more information about the page in an exhibit attached to his response brief (*see* Pl.'s Resp. 8), but as noted above, the Court cannot consider such an exhibit in deciding a motion to dismiss.  The complaint alleges that Homrich posted a video to the page, and that the City "then immediately blocked Mr. Homrich from further access to the City of Wyoming's Facebook page, and it deleted Mr. Homrich's previous comments from its Facebook page."  (Compl. ¶¶ 38-39.) These allegations imply that prior to Homrich's video, the City had allowed him to post on its page—in other words, it did not simply ban all users from posting.  Given the inherently interactive nature of Facebook, these facts are enough to infer that the page constitutes a public forum rather than a venue for government speech, and therefore that the First Amendment regulates the City's decisions to block users.

Homrich has also plausibly alleged that the City blocked him because he posted a video criticizing them, which is a clear case of viewpoint discrimination.  *See Blackwell*, 596 F. Supp. 3d at 923 ("[B]locking a commenter 'because of his allegation of governmental corruption' . . . 'constitutes black-letter viewpoint discrimination.'" (quoting *Davison*, 912 F.3d at 687)).  Because

the City may not engage in viewpoint discrimination in any type of forum, the Court need not determine which type the Facebook page is.[11]  *See id.* at 923.

Finally, Homrich has plausibly alleged that City itself is responsible for the Facebook ban. As indicated in the complaint, the City's Facebook page is the designated page for the City itself, rather than for any individual official.  (*See* Compl. ¶ 38-39.)  The Court of Appeals has recognized in a similar case that, "drawing all plausible inferences in [the plaintiff]'s favor, [a court] may infer that city employees monitor the postings and users of the City's official Facebook page either by exercising their discretion or by measuring posted content against a formal or informal policy." *Lloyd*, 2018 WL 11298664, at *4.  Either possibility can create municipal liability.  *Id.*; *see also Robinson v. Hunt County*, 921 F.3d 440, 449 (5th Cir. 2019) ("That the [Facebook] post was made in the name of the [sheriff's office] lends it some official imprimatur, and gives rise to a reasonable inference that the statement can be fairly identified as an action of the government itself." (internal quotation marks omitted)).  Therefore, Homrich has stated a First Amendment claim against the City.

### C. Leave to Amend

In his response to the motion to dismiss, Homrich requested leave to amend his complaint to include further allegations about the City's liability for his arrest.  (Pl.'s Resp. 10.)  Specifically, Homrich claims that the documents added to the record by Defendants indicate the Wyoming City Attorney signed the warrant request.  (*Id.* at 9; *see* Aff. & Warrant, PageID.68.)  A court can deny a motion for leave to amend when the proposed amendment would not save the claim from a

---

[11] A Facebook page is not a traditional public forum because social media is a recent invention.  As the Supreme Court has explained, "[t]he doctrines surrounding traditional public forums may not be extended to situations where such history is lacking."  *United States v. Am. Library Ass'n*, 539 U.S. 194, 205-06 (2003); *see also Price*, 2018 WL 3117507, at *15 ("[T]his Court would be inclined to find that the City's official Twitter accounts do not constitute a traditional public forum.").

motion to dismiss.  *Sanders v. Mich. Supreme Ct.*, 329 F.R.D. 174, 176 (E.D. Mich. 2019).  Based on the limited information in Homrich's response brief, it is unclear whether the proposed amendment would be futile.  Homrich's *Monell* claim would require that the warrant request was made by an official with policymaking authority—i.e., the City Attorney, rather than someone who merely works at that office.  But the warrant itself does not make clear what the prosecuting official's position with the City was.

Given the lack of clarity as to the basis for Homrich's amended *Monell* claim, and the fact that the request for leave was not properly contained in a motion, the Court declines to rule on the request.  "A request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend."  *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) (alteration in original) (internal quotation marks omitted); *see In re Omnicare, Inc. Sec. Litig.*, No. 11-CV-173-DLB-CJS, 2013 WL 1248243, at *17 (E.D. Ky. Mar. 27, 2013) ("[A]n informal request contained in a opposition memorandum to a motion to dismiss is not a substitute for a properly filed motion.").  The Court's local rules also require that Homrich file a proposed amended pleading, *see* W.D. Mich. LCivR 5.7(f), which he has not done.  If Homrich wishes to amend his complaint, he can file a proper motion to do so.

## IV. CONCLUSION

As explained above, the Court will dismiss, for lack of standing, Homrich's claims as to the constitutionality of § 50-63 or his arrest, to the extent that he seeks declaratory relief.  The Court will also dismiss, for failure to state a claim, Homrich's (1) Fourth Amendment false arrest and malicious prosecution claims against the City; (2) Fourth Amendment excessive force and unreasonable search claims against all Defendants; (3) First Amendment retaliatory arrest claim against the City; (4) First Amendment challenge to § 50-63; (5) state law false arrest/imprisonment

and battery claims against the City; and (6) First Amendment claims against the individual Defendants for the Facebook ban.

Homrich's surviving claims are his (1) Fourth Amendment false arrest and malicious prosecution claims against the individual Defendants; (2) First Amendment retaliatory arrest claims against the individual Defendants; (3) state law false arrest and battery claims against the individual Defendants; and (4) First Amendment claim against the City for the Facebook ban.

An order consistent with this Opinion will issue.


Dated: September 15, 2025                    /s/ Hala Y. Jarbou
                                             HALA Y. JARBOU
                                             CHIEF UNITED STATES DISTRICT JUDGE