UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT HOMRICH,

      Plaintiff,

                                         Case No. 1:25-cv-296

v.

                                         Hon. Hala Y. Jarbou

CITY OF WYOMING, et al.,

      Defendants.

_____/

## **OPINION**

In this lawsuit brought under 42 U.S.C. § 1983, Robert Homrich alleges that the City of Wyoming, Michigan, violated the First and Fourth Amendments by arresting him in retaliation for his repeated calls to City Hall and violated the First Amendment by banning him from the City's Facebook page when he posted critical comments.  Homrich brings (1) Fourth Amendment false arrest and malicious prosecution claims against two Wyoming police officers, Kip Snyder and Chad Lynn; (2) First Amendment retaliatory arrest claims against Snyder and Lynn; (3) Michigan law false arrest and battery claims against Snyder and Lynn; and (4) a First Amendment free expression claim against the City for the Facebook ban.  Defendants now move for summary judgment on all claims; Homrich moves for summary judgment on all claims except those for retaliatory arrest.

For the reasons explained below, the Court will grant in part and deny in part both motions for summary judgment.  The Court will grant summary judgment to Defendants Snyder and Lynn on Homrich's Fourth Amendment claims, state law claims, and First Amendment retaliation claims.  The Court will grant summary judgment to Homrich on one aspect of his First Amendment free expression claim, but deny summary judgment to both sides regarding the remainder of this

claim.  The Court will also dismiss Snyder and Lynn from the case because no claims against them remain.

## I. BACKGROUND

### A. Calls to City Hall

The background for this lawsuit began on April 13, 2022, when Homrich was taken to Metro West Hospital in Wyoming, Michigan, due to a severe asthma attack.  (Homrich Aff. 1–2, ECF No. 43.)  Hospital staff administered a medication to Homrich that appeared to cause unpleasant side effects.  (*See id.* at 2; Homrich Dep. 77–78, ECF No. 39-3.)  At some point, an altercation occurred between Homrich and a hospital security guard, the details of which were disputed by the participants and are not relevant to this case.  (*See* Homrich Dep. 51.)  The Wyoming Police Department received a complaint regarding the altercation and sent a report to Deputy City Attorney Heather Chapman regarding possible assault charges against Homrich.  (*See* Chapman Dep. 16, 58, ECF No. 39-7.)  Chapman ultimately declined to charge Homrich in accordance with the preferences of the security guard.  (*Id.* at 58.)

On May 16, Homrich called the City to request that it prosecute the security guard, who Homrich claimed had assaulted him.  (*Id.* at 59.)  However, Chapman concluded that prosecution of the security guard would be unsuccessful based on the available evidence.  (*Id.* at 60.)  She "gave [Homrich] an opportunity to provide additional information, and he did so," but the new information did not change Chapman's position.  (*Id.* at 41–42.)  Homrich called Chapman on June 2 to speak about the issue, but she "flatly refused to consider criminal charges against any member of the hospital staff."  (Homrich Aff. 2–3.)

Around this time, Homrich repeatedly called the City Attorney's office.  (Chapman Dep. 19.)  Chapman testified that "[w]e had received several calls to our office from Mr. Homrich, so much so that nothing was happening in our office other than receiving calls on different lines from

Mr. Homrich." (*Id.*)  In their conversations, Chapman explained her decision to not bring charges against the security guard, but Homrich was unsatisfied.  (*See id.* at 40.)  According to Chapman, the issues Homrich raised had been sufficiently "resolved," but Homrich "ke[pt] coming back to the same points" and would not "chang[e] course or accept[]" her answers.  (*Id.*)  A call log created by the City indicates that Homrich called seven times on April 14, once on each of April 15, 18, 20, and 22, twice on both April 25 and May 16, once on both May 24 and 25, twice on May 26, once on June 1, and ten times on June 2.  (Call Log, ECF No. 39-10, PageID.453–455.)  However, Homrich testified that the call log is inaccurate because it counts some calls multiple times. (Homrich Dep. 97.)

On June 2, Chapman's supervisor instructed her to stop answering Homrich's calls. (Chapman Dep. 51.)  When he no longer got a response from Chapman, Homrich began to contact other City officials about the issue.  He called Emily Vandegriend in Human Resources to file a complaint against Chapman, but he did not get a response.  (Homrich Aff. 3.)   He spoke with Conner Zuidema, also in Human Resources, who told him to contact Jennifer Stowell, an assistant to the City Manager.  (Homrich Dep. 82; Chapman Dep. 64.)  Homrich then called Stowell several times and left voicemail messages, but received no response.  (Homrich Aff. 3.)  In August of 2022, Stowell or someone else in the City Manager's office contacted the Deputy Police Chief, Defendant Snyder, about Homrich's calls.  (Snyder Dep. 12, ECF No. 39-5.)  This person told Snyder that Stowell had received a "voluminous number of phone calls from" Homrich that "were causing . . . Stowell . . . a great deal of fear and anxiety."  (*Id.* at 13.)  The City gave Stowell a police escort when she walked between her car and the office, and "provided additional security in her neighborhood and patrolling the building where she lived."  (Chapman Dep. 43.)

After the issue was brought to Snyder's attention, he spoke with other officials, including City Attorney Scott Smith, about the situation. (Snyder Dep. 14.) Smith indicated that Homrich's behavior violated the City's "[h]arassing communication" ordinance, which provides that "[i]t shall be unlawful for any person by the use of a telephone, to . . . [d]isturb the peace, quiet, or privacy of any person or family by repeated and continued calls intended to harass or disturb the person or family to whom the calls are made." (Wyoming, Mich., Mun. Code § 50-63(a), ECF No. 11-1; Snyder Dep. 68.) Snyder and Smith decided to talk to Homrich and try to persuade him to stop calling. (Snyder Dep. 68–69.) On August 4, 2022, Snyder called Homrich and told him that he needed to stop calling City Hall or else he would be criminally charged under the harassing communications ordinance. (Homrich Aff. 3.) Homrich responded that he "was simply calling the city with questions and concerns that had not been answered, and [he] had a First Amendment right to petition the government for a redress of grievances." (*Id.*) After the conversation ended, Homrich called Stowell and left a message stating,

> I think you might have misunderstood me. Calling the police on me is not going to make the problem go away, it's actually going to make it worse. I'm not trying to threaten, I'm not trying to harass, I have legitimate questions and concerns that you are avoiding. You do have an obligation to the people, so I would like to voice these questions and concerns so that we can get the matter resolved and I can move forward.

(8/4/2023 Stowell Voicemail, ECF No. 44-4.) Homrich then called Snyder back and reiterated his view that he was entitled to keep calling the City until he received a satisfactory response. (8/4/2023 Snyder Call, ECF No. 44-3.)

Defendant Lynn became involved in the case around this time. A supervisor briefed him about the "ongoing thing with Mr. Homrich" and asked Lynn to investigate and write a report. (Lynn Dep. 12, ECF No. 44-19.) Lynn spoke with Snyder, Vandegriend, and Zuidema about their interactions with Homrich. (*Id.* at 14–17.) Lynn then wrote a report, which contains the following

information.  Homrich "repeatedly called numerous city departments," and called some "up to (10) times in one day."  (Lynn Rep. 2, ECF No. 39-9.)  Homrich "also left numerous voicemail messages," which "began to concern Jennifer Stowell as she indicated to Deputy Chief Snyder on 08/04/22 that she feared [Homrich] could show up to the city offices."  (*Id.*)  Chapman had "explained previously why the security guard was not charged," and "staff members . . . were providing [Homrich] with the information that he requested," but Homrich continued to call.  (*Id.* at 2–3.)  When Snyder told Homrich that he could be criminally charged if he continued to call, Homrich responded with "aggressive and hostile behavior."  (*Id.* at 3.)  Homrich then called Stowell three more times and stated that "calling the police" would only "make it worse."  (*Id.* at 3.)  Lynn also obtained a log of Homrich's calls to the City, which indicated "that between 04/14/22 and 08/08/22, [Homrich] called the city approximately (62) times," and that on June 24, 2022, Homrich called Stowell "approximately (9) times within two hours."  (*Id.* at PageID.446; *see* Call Log, PageID.453–458.)

On August 18, Lynn sought a warrant for Homrich's arrest based on his violation of the harassing communications ordinance.  (Warrant Request, ECF No. 44-8, PageID.593.)  A magistrate judge approved the warrant (Warrant, ECF No. 44-9, PageID.595), and Homrich was ultimately arrested by the Ottawa County Sheriff's Office on October 26, 2022 (Lynn Rep. 5).  On September 13, 2023, the City agreed to dismiss the charges against Homrich pursuant to a joint stipulation.  (Stipulated Dismissal, ECF No. 39-11.)

### B. Facebook Ban

The City operates a public Facebook page that allows users to comment on its posts.  (*See* Peña-Wojtanek Dep. 14, ECF No. 39-8.)  In 2022, the City's social media policy provided that "[c]omments not related to the business or work of this department/office or to the particular social media article commented upon may be deleted," and "[m]ultiple or repetitive posts that are copied

5

and pasted may be deleted." (2021 Social Media Policy, ECF No. 39-13, PageID.473.) The Facebook page is monitored by City employees, including Brianna Peña-Wojtanek, the City's communications specialist. (*See* Peña-Wojtanek Dep. 12, 14.) Peña-Wojtanek "received guidance" regarding Facebook moderation decisions from the deputy city manager, who is in charge of City communications. (*Id.* at 15.)

At some point in 2022, Chapman contacted Peña-Wojtanek to tell her that Homrich "may appear on social media," and asked Peña-Wojtanek to "let her know if that happened." (*Id.* at 22.) On September 3, 2022, Homrich posted a YouTube video that contained an account of his dispute with the City and accused the City of threatening to arrest him for raising legitimate concerns. (Homrich Aff. 4; YouTube Video, ECF No. 39-17.) Homrich later posted a comment on the Facebook page containing a link to the YouTube video. (Homrich Aff. 4.) Homrich's story was picked up by James Freeman, who runs a YouTube channel with a large online following. (Peña-Wojtanek Dep. 27.) After Freeman posted an interview with Homrich, the City began getting "non-stop" calls that used "threatening" and "aggressive language." (*Id.* at 30.) However, there is no evidence that any of the threatening calls were from Homrich. (*See* Snyder Dep. 59–60; Chapman Dep. 22.) The City also received numerous comments on its Facebook page regarding the Freeman video. (Peña-Wojtanek Dep. 33.)

Peña-Wojtanek informed the deputy city manager, John McCarter, and the city attorney, Scott Smith, about the Facebook comments. (*Id.* at 34.) She told them that people were leaving comments "on posts that weren't relevant to the comments that were being made." (*Id.* at 35.) Ultimately, Smith and McCarter instructed Peña-Wojtanek to block Homrich from the Facebook page. (*Id.* at 35.) Peña-Wojtanek did so, which meant that Homrich could no longer view or comment on the City's Facebook page. (*See id.* at 41.) His previous comments were also deleted.

(Homrich Aff. 4.)  According to Peña-Wojtanek, the decision to block Homrich was based on the fact that "they had . . . given Mr. Homrich a response prior that he maybe did not like and that's why we had these comments," so blocking Homrich was "kind of our only option at that point." (*Id.* at 36.)  Peña-Wojtanek also stated that Homrich was blocked "[b]ecause of the repeated calls and social media comments."  (*Id.*)  McCarter testified that "[i]t was the repeated posting of the same material over and over again which led to the decision to block Mr. Homrich."  (McCarter Dep. 19, ECF No. 39-6.)  Specifically, Homrich had repeatedly posted "a short blurb and then a link out to the [YouTube] video."  (*Id.*)  McCarter testified that the decision to block Homrich was made collectively by him, Peña-Wojtanek, Smith, Chapman, and City Manager Curtis Holt.  (*Id.* at 19–20.)

The stipulated dismissal of the charges against Homrich states that, for the following year, Homrich "shall comply with the City of Wyoming's Social Media Policy for any posts on the City's media platforms, including Facebook."  (Stipulated Dismissal 2.)  Chapman understood this condition as implying that Homrich would be unblocked from the City's Facebook page.  (*See* Chapman Dep. 46–47.)  On September 18, 2023, Chapman emailed Peña-Wojtanek to tell her to unblock Homrich, and Peña-Wojtanek responded that she would do so.  (Chapman Emails, ECF No. 39-16, PageID.484.)  In her deposition, Peña-Wojtanek did not recall being asked to unblock Homrich until late 2024.  (Peña-Wojtanek Dep. 41.)  Peña-Wojtanek attempted to do so, but she could not find Homrich's name on the blocked users list.  (*Id.* at 46.)  Peña-Wojtanek assumed that Homrich had deleted his account or blocked the City.  (*Id.*)  She frequently checked the blocked users list to see if Homrich's name would reappear, but it never did.  (*Id.*)  Homrich is no longer blocked from the City's Facebook page, though it is unclear exactly when that changed. (Homrich Aff. 4.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288–89 (1961)).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.*  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).  "This standard of review remains the same for reviewing cross-motions for summary judgment."  *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 411 (6th Cir. 2021).  "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  *Id*. at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial."  *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488 (6th Cir. 2024) (alteration in original) (quoting *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020)).  "[W]hen the moving party bears the burden of proof [at trial], their initial summary judgment burden is higher in that [they] must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."  *Id.* (cleaned up).  When the moving party does not bear the burden of proof at trial, they may meet their initial burden at

summary judgment by "submitting affirmative evidence that negates an essential element of the nonmoving party's claim," *Kava v. Peters*, 450 F. App'x 470, 473 (6th Cir. 2011) (cleaned up), or by "pointing out the lack of evidence to support an essential element" of that claim, *Rockwood Auto Parts, Inc. v. Monroe County*, 155 F.4th 557, 566 (6th Cir. 2025) (cleaned up).   The nonmovant must then present "sufficient evidence from which a jury could reasonably find in [their] favor." *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025) (cleaned up).

### III. ANALYSIS

#### A. Fourth Amendment - False Arrest and Malicious Prosecution

First, Homrich brings claims for false arrest and malicious prosecution under the Fourth Amendment against Snyder and Lynn for allegedly obtaining a warrant for his arrest without probable cause.  Defendants argue that they had probable cause to believe Homrich had violated Wyoming's harassing communications ordinance; in the alternative, they argue that qualified immunity bars liability.  As discussed below, the Court finds that Snyder and Lynn are entitled to qualified immunity on Homrich's Fourth Amendment claims.

Homrich's claims under § 1983 "are subject to the affirmative defense of qualified immunity."  *Regets v. City of Plymouth*, 568 F. App'x 380, 386 (6th Cir. 2014).  "Qualified immunity shields federal and state officials from money damages unless a plaintiff . . . show[s] (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 275 (6th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  "A right is clearly established for purposes of overcoming the qualified immunity defense only when 'existing precedent [has] placed the statutory or constitutional question beyond debate,' although [courts] do not require 'a case directly on point.'"  *Id.* (quoting *al-Kidd*, 563 U.S. at 741) (first alteration in original).  "[I]t is [the plaintiff]'s burden to identify a closely analogous precedent with 'facts like

the ones at issue here' that placed the constitutional question beyond debate" at the time the violation occurred. *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 603 (6th Cir. 2025) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021)). Defendants are entitled to summary judgment on the issue of qualified immunity if it is beyond factual dispute that their actions did not violate clearly established law. *See Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992).

Defendants argue that they are entitled to qualified immunity because they reasonably believed that probable cause existed to arrest Homrich. A lack of probable cause is a necessary element of Homrich's Fourth Amendment claims. *See Gardner v. Evans*, 920 F.3d 1038, 1064 (6th Cir. 2019) (false arrest); *Jackson v. City of Cleveland*, 925 F.3d 793, 820 (6th Cir. 2019) (malicious prosecution). "Generally, probable cause exists when the police have reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Ouza*, 969 F.3d at 279 (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000)) (omission in original) (cleaned up). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

There is no dispute that, at the time of Homrich's arrest, "it was clearly established that arrest without probable cause violates the Fourth Amendment." *Ouza*, 969 F.3d at 279. But that fact alone is not sufficient to overcome qualified immunity, because a plaintiff must show that the relevant right was established at a sufficiently low level of generality. *See id.* at 280. "[T]he Supreme Court [has] emphasized the 'imprecise nature' of probable cause determinations, given that 'probable cause turns on the assessment of probabilities in particular factual contexts and cannot be reduced to a neat set of legal rules.'" *Id.* (quoting *Dist. of Columbia v. Wesby*, 583 U.S.

48, 64 (2018)) (cleaned up).  Thus, "the 'specificity' of the [clearly established] rule is 'especially important in the Fourth Amendment context.'" *Wesby*, 583 U.S. at 64 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  A plaintiff seeking to overcome qualified immunity must therefore "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Ouza*, 969 F.3d at 280 (quoting *Wesby*, 583 U.S. at 64) (omission in original).  Put another way, an officer is entitled to qualified immunity as long as they had "arguable probable cause" for an arrest.  *Haywood v. Hough*, 811 F. App'x 952, 961 (6th Cir. 2020).

Here, Homrich was arrested for "[d]isturb[ing] the peace, quiet, or privacy of any person or family by repeated and continued calls intended to harass or disturb the person or family to whom the calls are made."  Wyoming, Mich., Mun. Code § 50-63(a).  This criminal offense has three elements: (1) repeated calls, (2) intended to harass or disturb, (3) that disturb the peace, quiet, or privacy of any person.  There is no genuine dispute that probable cause existed regarding the first and third elements.  Homrich made repeated calls to Stowell, and Stowell was so disturbed that she received a police escort; moreover, these facts were known to Snyder and Lynn when the warrant was obtained. (*See* Chapman Dep. 43; Snyder Dep. 13; Lynn Rep. 2.)  The only contested issue is whether Defendants had arguable probable cause to believe Homrich made the calls with the intent to disturb or harass Stowell.[1]

As an initial matter, the ordinance's text does not clarify what is meant by "intended."  In criminal law, intent to achieve a given result may denote a purpose to achieve that result or merely knowledge that the result will occur.  "For centuries, common law judges, and then statute writers,

---

[1] The parties disagree about whether the City of Wyoming is a "person" that may be harassed under the ordinance; to avoid this issue, the Court treats Stowell as the relevant "person" for purposes of its probable cause analysis.  Given that the Court finds Defendants had arguable probable cause to believe Homrich had harassed Stowell, it is unnecessary to determine whether they also had arguable probable cause believe he had harassed the City itself.

have used the terms 'intend' or 'intent' without distinguishing between knowledge of consequences and a desire to achieve them." *United States v. Tobin*, 480 F.3d 53, 61 (1st Cir. 2007).[2]   And Michigan case law does not definitively indicate how the ordinance's intent requirement should be interpreted.  The Michigan Court of Appeals has held that a similar statute does not run afoul of First Amendment protections because it "includes a requirement that the caller act with specific intent" to harass.  *People v. Taravella*, 350 N.W.2d 780, 785 (Mich. Ct. App. 1984).  But that decision provides few clues as to what kind of intent is required, and it appears Michigan courts do not consistently use "specific intent" to refer to purpose rather than knowledge.  *Compare Travis v. Dreis & Krump Mfg. Co.*, 551 N.W.2d 132, 142 (Mich. 1996) ("[W]e conclude that the phrase 'specifically intended an injury' means that the employer must have had in mind a *purpose* to bring about given consequences." (emphasis added)) *with People v. Gould*, 570 N.W.2d 140, 144 (Mich. Ct. App. 1997) ("[S]pecific intent has been defined as the subjective desire *or knowledge* that the prohibited result will occur." (emphasis added)), *and People v. Whitney*, 578 N.W.2d 329, 341 (Mich. Ct. App. 1998) ("To commit a specific intent crime, 'an offender would have to subjectively desire *or know* that the prohibited result will occur . . . .'" (emphasis added) (cleaned up) (omission in original)).

Perhaps the best reading of the harassing communications ordinance is that it requires a subjective purpose to harass, rather than mere knowledge that harassment will occur.  "A number of states, although by no means all, do construe their own harassment statutes in this fashion . . . ." *United States v. Tobin*, 552 F.3d 29, 34 (1st Cir. 2009) (interpreting federal harassing

---

[2] The ordinance here requires specific intent—meaning that the perpetrator must intend both an action and the consequences of that action—but the general/specific intent distinction is independent from the knowledge/purpose distinction. *Tobin*, 480 F.3d at 61 ("'[S]pecific intent'—although often equated with 'purpose'—can as easily describe any additional intent requirement (whether knowledge or purpose) beyond the mental state—normally knowledge— required for the *actus reus*.").

communications statute to require purpose); *see also* Mich. Comp. Laws 750.411i(1)(d) (defining "harassment" in context of stalking to mean conduct that does not "serve[] a legitimate purpose"). But given the lack of clarity on this matter, it is not clearly established that the harassing communications ordinance requires purpose rather than merely knowledge.  Thus, Defendants are entitled to immunity if they had arguable probable cause to believe that Homrich knew his calls would cause Stowell to be harassed.  *See Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012) (qualified immunity shields officers who make reasonable mistakes of law).

Viewing the facts in the light most favorable to Homrich, the Court finds that Defendants had arguable probable cause to believe that Homrich had violated the ordinance.  As indicated by the police report, Lynn believed that Homrich had called the City 62 times within four months; by the Court's count, 27 of those calls were to Stowell's extension.  (*See* Call Log; Lynn Rep. 3 (noting Stowell's extension).)  Lynn also believed that Homrich had called the City ten times in a day, and had called Stowell nine times within two hours.  (Lynn Rep. 2–3.)  Although the calls to City officials other than Stowell were presumably not intended to harass Stowell, they still provide evidence as to Homrich's intent—that is, whether Homrich was making the calls to express his grievances or merely to badger City employees.  Indeed, someone at the City Attorney's office told Lynn that Homrich's concerns regarding the hospital incident had already been addressed, but he continued to call.  (*See id.* at 3.)  Lynn also recorded in his report that Snyder had told Homrich his calls constituted "harassment" (*id.* at 3); Homrich's response was to immediately call Stowell again.  Based on these facts, a reasonable officer would not have viewed it as beyond debate that Homrich lacked the requisite intent.

Homrich contests the accuracy of the call records provided to Lynn (*see* Homrich Dep. 97), but he does not dispute that those were the records Lynn relied on or that it was reasonable for

Lynn to rely on them.  Thus, the accuracy of the records has no bearing on the existence of probable cause.  Homrich also argues that the warrant request Lynn submitted was facially deficient because it merely quoted the ordinance without including any underlying facts.  *See Homrich*, 800 F. Supp. 3d at 819.  It is not clear from the record exactly what information was provided to the magistrate who issued the warrant.  (*See* Lynn Dep. 25 (testifying that he provided the magistrate with the police report); Price Dep. 11, ECF No. 44-22 (testifying that he did not recall receiving the police report).)  But the sufficiency of the warrant is irrelevant because Lynn and Snyder are not relying on it to avoid liability.  The sufficiency of a warrant comes into play when an officer who arrested someone without probable cause seeks to avoid liability due to their good-faith reliance on a warrant.  *See, e.g.*, *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012).  Lynn and Snyder are not arguing that they relied on the warrant; rather, they are arguing that they reasonably believed that probable cause existed for the arrest.  Thus, the contents of the warrant request are immaterial.

More broadly, Homrich does not point to any case law regarding an officer's ability to reasonably infer a plaintiff's intent, let alone case law that clearly establishes a right violated by Defendants' actions.  And this is not the sort of "obvious case" where a general standard "can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).  In short, because the officers had arguable probable cause to arrest Homrich, they are entitled to qualified immunity.

There is another possible avenue for Homrich to bring his false arrest claim, but it also fails.  Even if there was arguable probable cause to believe Homrich's conduct violated the harassing communications ordinance, his arrest would be unlawful if his underlying conduct was protected by the First Amendment.  *See Patrizi v. Huff*, 690 F.3d 459, 467 (6th Cir. 2012) ("An officer may not base his probable-cause determination on speech protected by the First

14

Amendment.").    Along  the  same  lines,  his  arrest  would  be  unlawful  if  the  harassing

communications ordinance were "flagrantly unconstitutional." *Leonard v. Robinson*, 477 F.3d

347, 359 (6th Cir. 2007); *see also Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979).  But as

explained below, it is not clearly established that Homrich's speech was constitutionally protected

or (as a corollary) that the harassing communications ordinance was unconstitutional as applied to

him. *See Novak v. City of Parma*, 33 F.4th 296, 305 (6th Cir. 2022) (granting qualified immunity

where "the officers could reasonably believe that some of [the plaintiff's] activity was . . . not

protected, and [thus was] fair grounds for probable cause").

The Sixth Circuit has held that a statute may criminalize harassing communications without

running afoul of the First Amendment because the category of "harassing speech" is not content-

based, and because people have a right to be free from unwanted communication. *Hagedorn v.

Cattani*, 715 F. App'x 499, 507 (6th Cir. 2017) (citing *Rowan v. U.S. Post Office Dep't*, 397 U.S.

728, 736–38 (1970)); *see also United States v. Bowker*, 372 F.3d 365, 379 (6th Cir. 2004)

(upholding  conviction  under  telephone  harassment  statute).[3]    It  is  true  that  a  harassing

communications statute is more likely to infringe on First Amendment rights when applied to

communications with government officials. *See Bowker*, 372 F.3d at 379 ("For example, if [the

defendant] had been charged with placing anonymous telephone calls to a public official with the

intent to annoy him or her about a political issue, the telephone harassment statute might have been

unconstitutional  as  applied  to  him."); *Hagedorn*, 715 F. App'x at 507 ("We recognize [the

plaintiff's] right to speak out on a matter of public concern, but she does not have an uninhibited

right to do so to an official's private email account after he asks her to stop."); *United States v.*

---

[3] The opinion in *Bowker* was subsequently vacated, *see Bowker v. United States*, 543 U.S. 1182 (2005), but it was restored in relevant part on remand, *see United States v. Bowker*, 125 F. App'x 701, 701 (6th Cir. 2005).

*Popa*, 187 F.3d 672, 677–78 (D.C. Cir. 1999) (harassing communications ordinance was unconstitutional as applied to defendant who called U.S. Attorney's office seven times).  But even if the application of the harassing communications ordinance here was unconstitutional, the uncertainty within this area of law prevents its unconstitutionality from being clearly established.  Thus, Defendants could reasonably rely on the ordinance when seeking an arrest warrant, and are entitled to qualified immunity.

### B. First Amendment - Retaliatory Arrest

Homrich also brings claims against Snyder and Lynn for retaliatory arrest.  "To allege a retaliation claim, [a plaintiff] must show that: (1) he engaged in a constitutionally protected activity, (2) the officers' adverse actions caused [him] to suffer an injury that would likely chill a person of ordinary firmness from continuing that activity, and (3) the officers were motivated, at least in part, by his exercise of his constitutional rights." *Novak*, 932 F.3d at 427 (internal quotation marks omitted).  Homrich contends that Snyder and Lynn caused him to be arrested based on his criticism of the City.  But if officers have probable cause to arrest a person, a plaintiff generally cannot bring a retaliatory arrest claim based on the officers' subjective intent.  *Nieves v. Bartlett*, 587 U.S. 391, 406 (2019).

There are two narrow exceptions to this rule: when "the plaintiff [i]s arrested pursuant to an alleged 'official municipal policy' of retaliation," or when the plaintiff is arrested under "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 398, 406.  The "official municipal policy" exception "does not apply where, as here, the plaintiff sues individual officers" in their personal capacities.  *Novak*, 932 F.3d at 429; *accord Frenchko v. Monroe*, 160 F.4th 784, 803 (6th Cir. 2025).  As to the exception for selective enforcement, Homrich argues that "there is no evidence that anyone other th[a]n Mr. Homrich was arrested for his posting comments to the City of Wyoming" Facebook

16

page.  (Pl.'s Resp. 8, ECF No. 46.)  But this unsupported assertion does not establish a retaliatory arrest claim.  *See Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (per curiam) ("To fall within the [selective enforcement] exception, a plaintiff must produce evidence to prove that his arrest occurred in such circumstances.").  Moreover, the proper comparator would not be someone who merely posted on Facebook, but someone who repeatedly called the City.  Homrich points to no evidence regarding how the City usually treats people who engage in the same conduct as him, so his claim does not fit within this exception.

In short, because the exceptions articulated in *Nieves* do not apply here, Defendants' arrest of Homrich was constitutional regardless of their personal motives as long as probable cause existed to support the arrest.  Defendants' assertion of a qualified immunity defense raises an additional wrinkle, however: Does the bar to liability established in *Nieves* apply only when probable cause *actually* exists for an arrest, or also when it is not clearly established that probable cause does *not* exist?  In other words, are Defendants entitled to qualified immunity from Homrich's retaliatory arrest claim if they had arguable probable cause, but not actual probable cause?  For the reasons explained below, the Court concludes that (as in the Fourth Amendment context) Defendants need to show only arguable probable cause.

Many courts—including the Sixth Circuit—have required only arguable probable cause in the retaliatory arrest context, albeit without significant analysis of the issue.  *See Novak*, 33 F.4th at 305 (granting qualified immunity on retaliatory arrest claim because "officers had good reason to believe they had probable cause"); *Just v. City of St. Louis*, 7 F.4th 761, 768 (8th Cir. 2021) ("Like a Fourth Amendment claim for a wrongful arrest, a First Amendment retaliatory arrest claim is defeated by a showing of probable cause (or arguable probable cause)."); *Somers v. Devine*, 132 F.4th 689, 697 (4th Cir. 2025); *Roy v. City of Monroe*, 950 F.3d 245, 255 (5th Cir.

2020); *Redd v. City of Enter.*, 140 F.3d 1378, 1383 (11th Cir. 1998); *Detreville v. Gurevich*, No. 24-1427, 2025 WL 1874587, at *6 (10th Cir. July 8, 2025).  But at least one circuit has disagreed, requiring officers to have actual rather than arguable probable cause.  *Bassford v. Newby*, No. 24-5525, 2025 WL 2452367, at *2 (9th Cir. Aug. 26, 2025).  And although *Novak* is binding here, the Sixth Circuit has separately suggested (in dicta) that arguable probable cause may be insufficient to establish qualified immunity. *See Blackwell v. Nocerini*, 123 F.4th 479, 492 (6th Cir. 2024).  It is therefore useful to explain why the Court agrees with *Novak*'s holding that arguable probable cause is sufficient.

The argument for requiring actual rather than arguable probable cause rests on the distinction between rights and remedies.  Qualified immunity bars recovery when it is not clearly established that the officers' actions violate an individual's rights.  The doctrine allows officers to take actions that they reasonably believe comport with the Constitution, even if they later turn out to be mistaken.  If officers know that their actions violate the Constitution but mistakenly think the victim will have no *remedy* for that violation, the rationale for qualified immunity seems inapposite: there is no reason to protect officers who reasonably believe they will be able to get away with violating the Constitution.  Put another way, "there is no risk of 'dampen[ing] the ardor' of faithful public officials by denying qualified immunity when rights are clearly established but remedies are not." *Villarreal v. City of Laredo*, 134 F.4th 273, 281 (5th Cir. 2025) (en banc) (Oldham, J., concurring) (alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Court finds this line of reasoning plausible, although it notes that the Supreme Court has expressly declined to rule on this issue. *See Reichle v. Howards*, 566 U.S. 658, 669 n.6 (2012)

18

("Nor need we decide whether that distinction [between rights and remedies] matters [for qualified immunity].")).[4]

Assuming that the applicability of qualified immunity depends only on whether the contours of a right (but not the availability of a remedy) are clearly established, the next question is whether the probable cause bar is a limit on the right to be free from retaliatory arrest or a limit on the remedy for violations of that right. In *Reichle*, the Supreme Court noted that the answer to this question was unsettled. *Id.* The Court did "not resolve whether [the probable cause bar] is best read as defining the scope of the First Amendment right or as simply establishing a prerequisite for recovery" because "[i]t suffice[d], for qualified immunity purposes, that the answer would not have been clear to a reasonable official when [the plaintiff] was arrested." *Id.* In other words, if it is not obvious whether a retaliatory arrest accompanied by probable cause is an unredressable First Amendment violation or not a First Amendment violation at all, then it is not clearly established that arresting someone under such circumstances violates that person's First Amendment rights. And if it is not clearly established that an arrest violates someone's rights, an officer is protected by qualified immunity.

In a concurrence to the Fifth Circuit's en banc decision in *Villarreal*, 134 F.4th at 279–80, Judge Oldham argued that two Supreme Court cases issued subsequent to *Reichle*—namely, *Nieves* and *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018)—clarified that the probable cause bar is merely a remedial limitation. But the Court disagrees. The concurrence first cited the Supreme Court's observation in *Lozman* that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech," but "if there is probable

---

[4] One may doubt whether a principled line can even be drawn between rights and remedies, given their interconnected nature; "the distinction between rights and remedies is often a slippery one." *Osagiede v. United States*, 543 F.3d 399, 407 (7th Cir. 2008).

cause to believe the person has committed a criminal offense there is often no *recourse* for the deprivation." *Lozman*, 585 U.S. at 90 (emphasis added), *quoted in Villarreal*, 134 F.4th at 279 (Oldham, J., concurring).  This framing suggests that when an officer has probable cause to conduct an arrest but does so for retaliatory reasons, the person's rights have been violated even if they have no remedy.  In context, however, the quoted language from *Lozman* does not support this interpretation.  The full statement from *Lozman* is that "[a]n arrest deprives a person of essential liberties, but if there is probable cause to believe the person has committed a criminal offense there is often no recourse for the deprivation." *Id.*  Notably, this sentence appears before the reference to retaliatory arrests, and refers instead to the deprivation of liberties inherent in *any* arrest.  The Supreme Court obviously did not mean that every arrest is a constitutional violation but only some are remediable.  Rather, it meant that the harms inherent in an arrest do not always give rise to constitutional claims—whether because the arrestee's constitutional rights are not violated or because they do not have a remedy.  Understood this way, *Lozman* does not clarify whether the probable cause limitation is related to rights or remedies.

The *Villarreal* concurrence also contended that the broader reasoning in *Lozman* implies that the probable cause bar is remedial in nature.  In *Lozman*, the Supreme Court held the probable cause bar to be inapplicable when the arrest was orchestrated by government policymakers rather than conducted by an individual officer.  The *Villarreal* concurrence noted that "whether an individual has a First Amendment right to be free from being arrested purely as retaliation for, say, his political or religious beliefs would not seem to turn on which government actor retaliates against him." *Villarreal*, 134 F.4th at 279 (Oldham, J., concurring).  But the reasoning of *Lozman* is more multifaceted than the *Villarreal* concurrence acknowledges.  In *Lozman*, the Court sometimes wrote in a remedial register, stating that the plaintiff's claim should go forward because

20

"there is a compelling need for adequate avenues of redress."  585 U.S. at 100.  But the Court also reasoned that the plaintiff's situation was particularly noteworthy because "[a]n official retaliatory policy is a particularly troubling and potent form of retaliation," *id.*, a consideration that could go either to the need for a remedy or the contours of the right.  Similarly, it is unclear whether the Court's concerns about the "risk of a flood of retaliatory arrest suits," *id.* at 101, justify a limit on remedies or rights.  And much of the rationale of *Lozman*—like the rationale of *Reichle* before it— centers on the practical challenge of proving that a defendant was motivated by retaliatory animus rather than legitimate considerations.  *See id.* at 100; *Reichle*, 566 U.S. at 668.  It is again hard to tell if a limitation based on the difficulty of determining an officer's true motive is best understood as rights- or remedies-related; arguably this evidentiary concern falls somewhere between the two.

The *Villarreal* concurrence also argued that *Nieves* supports its understanding of the probable cause bar as remedies-based.  *See Villarreal*, 134 F.4th at 279–80 (Oldham, J., concurring); *see also Nieves*, 587 U.S. at 422 (Sotomayor, J., dissenting) ("[T]he issue here is not whether an arrest motivated by protected speech may violate the First Amendment despite probable cause for the arrest; the question is under what circumstances § 1983 permits a remedy for such a violation.").  In *Nieves*, the Supreme Court stated that "[a]lthough probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so."  587 U.S. at 406.  The *Villarreal* concurrence argued that this exception to the probable cause bar can only be justified by viewing that bar as a limitation on the available remedy, because it "makes little sense" to think that an "individual's First Amendment right" depends on whether "the police [do or] do not arrest other people."  134 F.4th at 280.  But it makes more sense than the concurrence suggests; after all, an individual's right to not be subject to a discriminatory arrest

under the Fourteenth Amendment also may hinge on whether the police arrest other similarly situated people.  *See Nieves*, 587 U.S. at 414 (Gorsuch, J., concurring in part).  And in justifying this rule, *Nieves* (like prior cases) placed significant weight on the challenges of proving causation when probable cause exists.  *See* 587 U.S. at 407 ("That showing addresses *Hartman*'s causal concern by helping to establish that 'non-retaliatory grounds [we]re in fact insufficient to provoke the adverse consequences.'" (alteration in original) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006))).  As noted above, the Supreme Court's concerns about proving causation do not neatly fit into the category of rights or remedies.

In sum, the Court is not persuaded that *Lozman* and *Nieves* clarify how to categorize the probable cause bar.  For the most part, these cases simply do not draw a clear distinction between limitations on rights and limitations on remedies, or between the distinct considerations that justify each type of limitation.  Given this lack of clarity, Defendants are entitled to qualified immunity.[5]

As noted above, *Blackwell* casts some doubt on this conclusion, but the Court finds its (non-binding) logic unpersuasive.  In *Blackwell*, the Sixth Circuit discussed the application of qualified immunity to retaliatory prosecution claims.[6]  123 F.4th at 492.  The specific issue was whether a plaintiff seeking to overcome qualified immunity must point to case law that establishes their rights at a low level of generality—as is usually required in a Fourth Amendment probable cause analysis—or whether it is sufficient in the First Amendment context to point to a case

---

[5] The Sixth Circuit's decision in *Novak* notes a potential exception to the probable cause bar: The existence of probable cause (or arguable probable cause) may not be a defense when "the sole basis for probable cause was speech" that allegedly violated a statute.  932 F.3d at 431.  In other words, if a plaintiff alleges that a defendant violated his First Amendment rights by retaliating for his speech, the defendant cannot avoid liability merely by asserting that probable cause existed to believe Plaintiff's speech constituted a crime.  But the Sixth Circuit noted that this potential exception "do[es] not bear on the qualified immunity analysis . . . because . . . the law is not clearly established."  *Id.* at 430.  Thus, the possible existence of this exception does not help Homrich either.

[6] The principles applicable to a retaliatory arrest claim are similar to those applicable to a retaliatory prosecution claim.  *See Nieves*, 401–04.  Indeed, the probable cause bar originated in the retaliatory prosecution context, and was only later extended to retaliatory arrest claims.  *See id.*

establishing the general right to be free from prosecution without probable cause. *Id.* at 492. The Sixth Circuit acknowledged that arguments could be marshalled for either view, and it did not definitively resolve the issue. *Id.* at 491–92. It noted, however, that

> retaliatory-prosecution claims under the First Amendment differ from Fourth Amendment claims in a material way. The Fourth Amendment generally adopts an objective test that renders an officer's motives for an action irrelevant. *See Nieves*, 587 U.S. at 403. A First Amendment retaliatory-prosecution claim, by contrast, requires plaintiffs to prove more than the absence of probable cause. This claim also requires a defendant to have harbored a "retaliatory motive" for a prosecution. *See Hartman*, 547 U.S. at 261. That officers must have acted with "subjective animus" in the First Amendment context reduces the concern that they will not know that their conduct violates the law. *Nieves*, 587 U.S. at 401. So perhaps plaintiffs should have to prove only that the officers harbored this retaliatory intent and that they acted without probable cause (without the need to identify similar probable-cause cases). *Cf. Novak*, 932 F.3d at 430. After all, wouldn't any officer "immediately" recognize the "unlawfulness" of pursuing a prosecution for the purpose of punishing speech protected by the First Amendment? *Wesby*, 583 U.S. at 64.

*Blackwell*, 123 F.4th at 492 (cleaned up). Following this line of reasoning, a plaintiff alleging retaliatory prosecution or arrest could overcome qualified immunity by showing that the officer was motivated by retaliatory animus and that probable cause did not exist; it would be irrelevant whether it was clearly established that probable cause did not exist under the circumstances. In other words, because a retaliatory arrest claim already requires the existence of an unlawful motive, there is no need to immunize officers who possess that motive but make a reasonable mistake as to whether the existence of probable cause would bar suit. So to raise a qualified immunity defense, an officer must show they had actual rather than arguable probable cause.

The problem with this line of reasoning is that it implicitly relies on the same rights-remedies distinction as the *Villarreal* concurrence. If *Nieves* entails that an officer who arrests someone due to retaliatory animus does not violate the First Amendment as long as probable cause exists, then the logic of *Blackwell* fails because establishing retaliatory animus does not establish that the officer knew they were acting unconstitutionally. Again, it is unnecessary to decide

23

exactly what *Nieves* and other cases held, because their holdings are ambiguous enough to engender doubt as to whether "any officer [would] 'immediately' recognize the 'unlawfulness' of pursuing a[n arrest] for the purpose of punishing speech protected by the First Amendment." *Blackwell*, 123 F.4th at 492. Rather, an officer who reads the Supreme Court's precedents may reasonably conclude that such an arrest would be lawful if supported by probable cause. *See Reichle*, 566 U.S. at 663 ("We conclude that, at the time of [the plaintiff's] arrest, it was not clearly established that an arrest supported by probable cause *could violate the First Amendment*." (emphasis added)).

In sum, it is an unsettled question whether the probable cause bar is a limitation on rights or remedies, so it is not clearly established that an officer violates an individual's First Amendment rights when they conduct an arrest that is motivated by retaliatory animus but supported by probable cause. *See Reichle*, 566 U.S. at 669 n.6. Thus, an arresting officer who reasonably believes that probable cause exists does not violate a clearly established First Amendment right, regardless of their motive. As the Court concluded in the context of Homrich's false arrest claim, Snyder and Lynn could have reasonably believed that probable cause existed. Accordingly, Homrich's retaliatory arrest claim is also barred by qualified immunity.

### C. State Law - False Arrest and Battery

Homrich also brings claims against Lynna and Snyder for false arrest and battery under state law. Like in the Fourth Amendment context, a state law false arrest claim requires the absence of probable cause. *See Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003). Along the same lines, an arrest does not constitute battery if the force used was "reasonably necessary to effect a *lawful* arrest," *Young v. Barker*, 405 N.W.2d 395, 402 (Mich. Ct. App. 1987) (emphasis added), that is, an arrest for which probable cause existed. Accordingly,

24

like Homrich's Fourth Amendment claims, his state law claims rise or fall based on the existence of probable cause.

Though qualified immunity does not apply to these state law claims, Defendants raise a state law defense of governmental immunity. In cases involving intentional torts, individual defendants have immunity for their acts if:

> (1) the acts were taken during the course of employment and the employees were acting, or reasonably believed that they were acting, within the scope of their authority, (2) the acts were taken in good faith, and (3) the acts were discretionary-decisional, as opposed to ministerial-operational.

*Bailey v. Fitzpatrick*, No. 329516, 2017 WL 104546, at *4 (Mich. Ct. App. Jan. 10, 2017) (quoting *Odom v. Wayne County*, 760 N.W.2d 217, 222 (Mich. 2008)). The Court's conclusion that Snyder and Lynn had arguable probable cause to arrest Homrich entails that the officers reasonably believed they were acting within the scope of their authority and acted in good faith.[7] Thus, they are entitled to governmental immunity.

### D. First Amendment – Free Expression

Finally, Homrich brings a First Amendment claim against the City for banning him from its Facebook page after he posted critical comments. Although the application of the First Amendment to social media pages is an unsettled area of law, the Court has previously concluded that the interactive nature of the City's Facebook page makes it a governmental forum. *Homrich v. City of Wyoming*, 800 F. Supp. 3d 801, 834 (W.D. Mich. 2025). There are four types of forums: traditional public forums, designated public forums, limited public forums, and nonpublic forums. *See Miller v. City of Cincinnati*, 622 F.3d 524, 534–45 (6th Cir. 2010); *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009); *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001).

---

[7] Homrich does not dispute that the act of obtaining a warrant is discretionary rather than ministerial.

Traditional public forums "include sidewalks, parks, and other areas that by tradition or by government fiat are open to public assembly and debate." *Miller*, 622 F.3d at 534 (cleaned up). Designated public forums are like traditional public forums but without the long historical practice; they are created "when [the government] opens a piece of public property to the public at large, treating as if it were a traditional public forum." *Id.* Limited public forums are "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Miller*, 622 F.3d at 534–35 (quoting *Summum*, 555 U.S. at 470). Finally, a nonpublic forum is government property that is "not by tradition or designation a forum for public communication." *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018). The Court determines what type of forum is at issue by inferring the government's intent from its "policy and practice." *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001).

Based on the evidence in the record, the Facebook page is a limited public forum. The page is open to the public but "dedicated solely to the discussion of certain subjects," *Miller*, 622 F.3d at 534–35 (quoting *Summum*, 555 U.S. at 470), namely the operations of City government. In a limited public forum, "[t]he government may restrict speech . . . as long as the restrictions do 'not discriminate against speech on the basis of viewpoint' and are 'reasonable in light of the purpose served by the forum.'" *Miller*, 622 F.3d at 535 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001)). There are two relevant restrictions contained in the City's social media policy: the rule that comments must be on topic, and the rule that comments may not be repetitive. Requiring that comments relate to the City or the post at issue is reasonable and viewpoint-neutral; indeed, topic restrictions are a quintessential feature of limited public forums. *See Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 519 (6th Cir. 2019) (upholding relevance rule in limited public forum). Prohibiting commenters from copying and pasting repetitive

26

comments is also reasonable and viewpoint-neutral.  *See Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 433–44 (6th Cir. 2009) (upholding policy barring repetitive speech at school board meetings).

The City argues that it banned Homrich from its Facebook page because he violated its social media policy.  Even if Homrich did violate the policy, the ban may still contravene the First Amendment if City officials were motivated to ban Homrich by other (non-policy-based) reasons. *See Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 251 (3d Cir. 1998) ("[S]tandards for inclusion and exclusion in a limited public forum must be unambiguous and definite if the concept of a designated open forum is to retain any vitality whatever." (cleaned up)); *see also United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 352 (6th Cir. 1998).  The evidence in the record as to the motives of City officers is mixed. Although McCardle testified that Homrich was banned due to policy violations (McCarter Dep. 19), Peña-Wojtanek suggested that there were other considerations, including Homrich's phone calls and the behavior of other people on social media who supported Homrich's criticism of the City (Peña-Wojtanek Dep. 34–36).

Insofar as City employees had multiple motives for banning Homrich, no First Amendment violation lies if they would have banned him for violating the policy regardless of his additional conduct.  *See Lowery*, 586 F.3d at 435 ("No violation occurs when the same result would have occurred in the absence of any illegitimate motive . . . ." (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286–87 (1977))).  But here, the evidence is insufficient to conclude as a matter of law that the City would or would not have banned Homrich based purely on his

alleged policy violations.[8]  In such situations, "the mixed-motive inquiry is one for the jury, not for [the Court], to decide." *Id.*

Furthermore, the mixed-motive inquiry is not necessary as to some of the City's actions that plainly contradict its own social media policy.  First, one of the rules that Homrich allegedly violated is the requirement that posts be on topic (McCarter Dep. 38), but Homrich's video was plainly "related to the business or work of" the City.  (2021 Social Media Policy, PageID.473.)  Defendants argue that the policy allows the deletion of comments that are unrelated to the post at issue, even if they relate to the City itself.  The policy states that "[c]omments not related to the business or work of this department/office or to the particular social media article commented upon may be deleted."  (*Id.*, PageID.473.)  Although this language is somewhat ambiguous, the more natural reading is that a comment must be related to *either* the post or the City, but need not be related to both.  Thus, Homrich's comments did not violate this provision of the policy.

Second, the policy only references the *deletion* of comments that violate the rules.  It does not provide that a person may be banned from the page entirely, nor does it state that violating the policy may cause one's previous (policy-compliant) comments to be deleted.  Even if the policy had authorized these penalties, it is not clear that they would be permitted as reasonable restrictions.  Courts are often skeptical of indefinite prospective restrictions on a speaker's access to a public forum.  *See Walsh v. Enge*, 154 F. Supp. 3d 1113, 1131 (D. Or. 2015) ("Maintaining decorum does not, however, require prolonged and prospective exclusions from a forum intended

---

[8] The Court is not aware of any Sixth Circuit case law directly addressing which party has the burden of establishing that a defendant would (or would not) have taken the same action regardless of the viewpoint-based motive in this context.  In the context of a First Amendment retaliation claim, once the plaintiff shows the defendant was motivated in part by the plaintiff's protected conduct, the defendant has the burden of showing they would have taken the same action regardless of the protected conduct.  *See Mt. Healthy*, 429 U.S. at 287.  The Sixth Circuit's citation to *Mt. Healthy* in *Lowery*, a free expression cases involving a public forum, suggests that the *Mt. Healthy* framework applies here.  *See Lowery*, 586 F.3d at 435.  Applying that framework, the Court will deny summary judgment to both sides because a reasonable jury could find for either party on the issue of whether the City would have banned Homrich regardless of his non-Facebook-related conduct.

for public discourse and debate."); *Gilmore v. Beveridge*, No. 2:22-cv-2032, 2022 WL 3139023, at *11 (D. Kan. Aug. 5, 2022); *cf. Reza v. Pearce*, 806 F.3d 497, 506 (9th Cir. 2015) ("No cases . . . even remotely suggest that [the government may] indefinitely ban an individual from a government building based on a single disruption of a hearing."). And it is hard to see how retroactively deleting Homrich's compliant comments furthers the forum's purpose at all.

Based on the above analysis, the Court finds that the City violated Homrich's First Amendment rights by banning him from Facebook and deleting his past policy-compliant comments. Thus, the Court will grant partial summary judgment to Homrich. *See* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."). The Court finds that a genuine dispute exists as to whether the City's deletion of Homrich's allegedly noncompliant posts also violated the First Amendment, and will deny summary judgment to both sides on that issue.

### IV. CONCLUSION

The Court will grant summary judgment to the City on Homrich's arrest-related claims. The Court will also grant summary judgment to Homrich on part of his free expression claim. The remainder of the free expression claim turns on factual disputes that must be resolved at trial. Because the Court is dismissing all claims against Defendants Lynn and Snyder, it will also dismiss them from the case.

An order will enter in accordance with this Opinion.

Dated: May 8, 2026                      /s/ Hala Y. Jarbou
                                        HALA Y. JARBOU
                                        CHIEF UNITED STATES DISTRICT JUDGE